Kaisheng Yang (SBN 343738)
E: kaisheng@yangesq.com
**LAW OFFICES OF KAISHENG YANG**
16755 Von Karman Ave, Ste 200
Irvine, CA 92606
T: (909) 529-1813

Attorney for Petitioner
Beijing Shangye Film and Television Culture Media Co., Ltd.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEIJING SHANGYE FILM AND TELEVISION CULTURE MEDIA CO., LTD., a Chinese corporation,<br><br>Petitioner,<br><br>vs.<br><br>UCFTI, INC., also known as, UCFTI EXPO, a California corporation; ZUOHONG CHEN, also known as, BIANCA CHEN, an individual,<br><br>Respondents. | Case No.: 2:24-CV-10338<br><br>**PETITION TO CONFIRM AND ENFORCE FOREIGN ARBITRATION AWARD AGAINST RESPONDENTS**<br><br>[PURSUANT TO NEW YORK CONVENTION, 9 U.S.C. SECTION 201, ET. SEQ.] |

Plaintiff BEIJING SHANGYE FILM AND TELEVISION CULTURE MEDIA CO., LTD. (hereinafter "Petitioner") hereby alleges as follows and requests that the Court confirms an arbitration award dated December 7, 2021, entered by Beijing Arbitration Commission/ Beijing International Arbitration Center (hereinafter "Arbitral Tribunal"), against UCFTI, INC., also known as, UCFTI EXPO (hereinafter "UCFTI") and ZUOHONG CHEN, also known as, BIANCA CHEN (hereinafter "Chen", collectively "Respondents").

## NATURE OF THE CASE

1.     Petitioner brings this proceeding pursuant to Chapter Two of the Federal Arbitration Act, 9 U.S.C. §201 *et seq.*, to confirm a final arbitration award rendered by the Arbitral Tribunal in Beijing, China, and to have judgment entered thereon in accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 300 U.N.T.S. 38 (1970) (hereinafter the "New York Convention"). The Arbitral Tribunal is an independent non-profit organization based in Beijing authorized by the laws of the People's Republic of China (hereinafter "PRC") whose awards are legally enforceable by the federal courts.

2.     On December 7, 2021, a three-member Arbitral Tribunal issued a final award in favor of Petitioner and granted Petitioner monetary damages against Respondents (hereinafter the "Award"). Petitioner now seeks confirmation and enforcement of the monetary damages provided in the Award.

## JURISDICTION

3.     The United States and the PRC are both signatories to the New York Convention..

4.     This Court has subject matter jurisdiction over this petition pursuant to 28 U.S.C. Section 1331, which states: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

5.     This Court also has subject matter jurisdiction to confirm an arbitral award that is governed by the New York Convention. Subject matter jurisdiction is conferred upon this Court by Section 203 of the Federal Arbitration Act, which provides: "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States shall have original jurisdiction over such action or proceeding, regardless of the amount in controversy." 9 U.S.C. §203.

6.     This Award falls under the New York Convention because: (1) the Award arose from a commercial relationship between the parties; (2) the parties agreed in writing to arbitrate the dispute arising from their contractual legal relationship; and (3) at least one of the parties is not a citizen of the United States. *See* 9 U.S.C. §202.

7.     This Court has personal jurisdiction over Respondent UCFTI because UCFTI was incorporated and operated under the laws of the State of California. UCFTI has, and at all times relevant, its principal place of business at 7083 Hollywood Blvd, 5th Floor, Los Angeles, CA 90028.

8.     This Court has personal jurisdiction over Respondent Chen because Chen resides at 7083 Hollywood Blvd, 5th Floor, Los Angeles, CA 90028.

## VENUE

9.     The venue is proper in this district under 28 U.S.C. §1391(b)(1), because all Respondents are residents of California, and resides in the County of Los Angeles located within the Western Division of the Central District of California. The venue is also proper in this district because pursuant to 9 U.S.C §204, in the absence of an agreement to the contrary, the venue is proper in any federal court that has subject matter jurisdiction.

## THE PARTIES

10.     Petitioner BEIJING SHANGYE FILM AND TELEVISION CULTURE MEDIA CO., LTD. is, and at all times relevant to this action, a Chinese corporation existing under and by virtue of the laws of the People's Republic of China, with its principal place of business in Beijing, China.

11.     Respondent UCFTI is, and at all times relevant to this action, a California corporation that conducts business in California with its principal place of business at 7083 Hollywood Blvd, 5th Floor, Los Angeles, CA 90028.

12.     Respondent Chen is, and at all times relevant to this action, a citizen of PRC and a lawful permanent resident of the United States and is domiciled in California. Respondent Chen is, and at all times relevant, the owner and/or Chief Executive Officer of UCFTI.

## FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

13.     On May 16, 2018, Petitioner and Respondent UCFTI entered into a written contract, agreeing that, in the consideration of $1.35 million United States dollars invested by Petitioner,

Respondent UCFTI shall cooperate with Petitioner to introduce and invest three films: Hostiles, Dragged Across Concrete, and Fronzo, in mainland China (hereinafter, the "Contract"). As the Contract agreed, after the invested fund was paid by Petitioner, Respondent UCFTI was obligated to transfer distribution rights of three films in mainland China to Petitioner and provide distribution rights vouchers to Petitioner according to the Contract. (Attached as Exhibit A is a true and correct copy of the Contract with a certified English-language translation).

14.    As agreed in the Contract, Respondent Chen shall be an individual guarantor to guarantee the performance of Respondent UCFTI pursuant to the Contract. Respondent Chen also agreed to be several and jointly liable for any and all damage caused by Respondent UCFTI as to the performance of the Contract.

15.    Petitioner performed its contractual duty and paid the invested fund of $1.35 million United States dollars to Respondent UCFTI in full as agreed. However, Respondent UCFTI did not transfer the corresponding proportion of the distribution rights of the three films in mainland China and it failed to provide the corresponding distribution right vouchers by the deadlines set forth in the Contract. Specifically, the Respondent UCFTI failed to transfer the corresponding proportion of the distribution right of the films Hostiles before June 2018, Dragged Across Concrete before August 2018, and Fronzo before December 2018 in mainland China and failed to provide the corresponding right voucher to the Petitioner in accordance with Paragraph I, Article 8 of the Contract. Moreover, the Respondent UCFTI did not obtain the Film Release License for the film Hostiles before June 2018, the film Dragged Across Concrete before October 2018, and the film Fronzo before March 2019 in accordance with Paragraph II, Article 8 of the Contract. Even though Respondent UCFTI was allowed to replace the above-described three films with other new films chosen and confirmed by Petitioner within a specific period of time according to the Contract terms to remedy the breach, Respondent UCFTI still failed to provide new films to replace the above-described three films and breached the Contract further.

16.    As agreed in the Contract, Petitioner was allowed to and indeed requested to cancel the Contract when Respondent UCFTI breached the Contract and could not perform the contractual duties obligated in the Contract. Upon Petitioner's request to conceal the Contract, as agreed in the Contract, Respondent UCFTI should return the full amount of $1.35 million United States dollars to Petitioner,

adding an annual interest rate of 20% calculated from the date Petitioner paid the investment fund to the date the entire investment fund was fully returned by Respondents.

17.      Since the cancellation conditions specified in the Contract were met, Petitioner made written notices to Respondents to cancel the Contract and requested returning its entire investment fund with interest as agreed in the Contract. However, the Respondents refused and failed to return Petitioner's investment fund and interest arising from Respondent UCFTI's breach of the Contract.

18.      Regarding the dispute resolution arising from the Contract, the Contract clearly stated in Article 12 that the performance of the Contract by parties is protected and governed by and interpreted according to the laws of the People's Republic of China, both parties shall negotiate friendly about any disputes arising from or in connection with the Contract for settlement, in spirits of fairness, justice, mutual understanding and mutual humility, and if negotiation fails, both parties shall apply to Beijing Arbitration Commission for arbitration in Beijing according to the existing Arbitration Rules.

**Arbitration Procedure of Beijing Arbitration Commission**

19.      On October 11, 2019, in Beijing Time, the Petitioner submitted the Arbitration Application and the Petitioner's evidence to the Arbitration Commission. On November 1, 2019, the Arbitration Commission delivered and served all arbitration documents to the Respondents' addresses. On November 25, 2019, the Arbitration Commission sent e-mails to confirm the delivery of arbitration documents. On November 30, 2019, Respondents acknowledged the receipt of arbitration documents and responded that they retained a law firm to represent them for the arbitration proceedings and provided the retained law firm's contact information to the Arbitral Tribunal. After getting in contact with the law firm retained by the Respondents, the Arbitral Tribunal sent the Arbitral Tribunal Formation Notice to the Petitioner and Respondents respectively, announcing that Mr. Xuehua Wang, Ms. Xijia Chen, and Mr. Chengwei Liu served as the arbitrators of the Arbitral Tribunal for the Contract dispute.

20.      After a couple of continuances and a temporary suspension of the arbitration hearing, the Arbitral Tribunal held the hearing on September 23, 2021, in Beijing, China (hereinafter the "hearing"). Parties submitted and supplemented their opinions and evidence accordingly before the hearing and during the hearing. In the hearing, the Arbitral Tribunal confirmed the authorization of the parties and their counsels. The retained law firm by Respondents clarified that it only represented Respondent UCFTI and

the law firm did not represent Respondent Chen. The retained law firm by Respondents confirmed the delivery of the arbitration documents during the pre-hearing procedure. Because Respondent Chen was properly served with arbitration documents and Respondent Chen had no justified reasons to be absent from the arbitration hearing, the Arbitral Tribunal conducted a default hearing on Respondent Chen in accordance with the provisions of Article 42 of the Arbitration Law of the People's Republic of China and Article 32 of the Arbitration Rules.

21.    During the hearing, the Arbitral Tribunal organized the parties to conduct arbitration procedures such as statement, defense, evidence and cross-examination, debate, and final statement. After the hearing ended, the Arbitral Tribunal sent these arbitration documents to Respondent Chen. Respondent Chen has not submitted any defense opinions till now after given written notice in this arbitration procedure.

22.    On December 7, 2021, the Arbitral Tribunal entered an arbitration award in favor of Petitioner against Respondents. (Attached as Exhibit B is a true and correct copy of the Arbitration Award with a Certified English-language Translation).

**The Arbitration Award**

23.    The Arbitral Tribunal rules as follows according to law: (1) Cancelling the Film Distribution Right Investment Contract entered into by and between the Petitioner and the Respondents on May 16, 2018; (2) The Respondent UCFTI should return the entire investment fund of USD 1.35 million to the Petitioner; (3) The Respondent UCFTI should pay an interest of USD 399,060 calculated to September 18, 2019 to the Petitioner and continue paying interest to the Petitioner based on USD 1.35 million according to the standard of annual interest rate of 20% from September 19, 2019 to the actual payment day; (4) The Respondent should pay Chinese Yuan or RMB 200,000 to the Petitioner to repay the Petitioner's expense for hiring a lawyer and Chinese Yuan or RMB 45,000 expense for temporary measures guarantee insurance; (5) the Respondent should pay Chinese Yuan or RMB 148,779.33 to the Petitioner to make up the arbitration fee paid by the Petitioner for it in advance; (6) Respondent Chen assumes limitless joint and several liability with Respondent UCFTI in regard of the funds which should be paid under the aforesaid (2) and (3) rulings (hereinafter, the "Award").

///

24.    The Arbitral Tribunal required Respondents to pay the arbitration award within 10 days from the day of delivery of the arbitration award. The arbitration award is final and shall take effect from the day it is made. As of today, Respondents have failed to comply with the arbitration award and refused to make a payment to Petitioner in accordance with the arbitration award.

## COUNT ONE

### (CONFIRMATION OF FOREIGN ARBITRATION AWARD)

### (By Petitioner Against All Respondents)

### (9 U.S.C. §207)

25.    Petitioner repeats and realleges each and every allegation contained in paragraphs 1 through 25 hereinabove and incorporate them by this reference as if fully set forth herein.

26.    The Award and the arbitration proceeding from which they were issued fully satisfy the requirements of the New York Convention and the Federal Arbitration Act. The Award should therefore be confirmed by the District Court.

27.    First, the Award fall under the New York Convention. An arbitral award falls under the New York Convention where it arises out of a legal relationship, which is considered commercial, including a transaction, contract, or agreement to arbitrate, and which is not entirely between citizens of the United States. See 9 U.S.C. § 202. The Award in this case arises out of two commercial legal relationships that are not entirely between citizens of the United States, as they involve a Chinese corporation and a California corporation and a Chinese citizen.

28.    Second, the requirements of Section 207 of the Federal Arbitration Act, which implements the New York Convention, are also met. Article III of the New York Convention provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon …." Section 207 of the Federal Arbitration Act provides, in turn, that "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention. 9 U.S.C. § 207. Here, this petition has been filed within the three-year

PETITION TO CONFIRM AND ENFORCE FOREIGN ARBITRATION AWARD AGAINST RESPONDENTS

time limitation applicable to the Award, which were rendered on December 7, 2021. There are no grounds for refusal or deferral of recognition or enforcement of the Award, as set forth in Article V of the New York Convention.

29.    Finally, enforcement is consistent with the "federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). As the Supreme Court observed, "at least since this Nation's accession in 1970 to the Convention, and the implementation of the Convention in the same year …, that policy applies with special force in the field of international commerce."

30.    Reflecting the strong federal policy favoring arbitration, "the confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).

31.    The Ninth Circuit has described and interpreted a review of arbitration under Section 207 as "quite circumscribed," offering district courts "little discretion." *Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992). Furthermore,  "[t]hese grounds for refusal must be invoked and proved by the party opposing confirmation of the award, …." *NAR S.p.A. - Industria Nastri Adesivi v. I.R. Indus.*, 5 F. Supp.2d 203 (S.D.N.Y. 1998). Finally, "the showing required to avoid summary confirmation is high." *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987). Even where § 207 defenses are raised by the opposing party, "[t]he public policy defense in particular must be construed very narrowly to encompass only those circumstances where enforcement would violate our most basic notions of morality and justice." *Yukos Capital*, 963 F. Supp.2d at 299 (internal quotation marks omitted).

32.    In sum, this petition satisfied all of the requirements of 9 U.S.C. Section 207 and there are no grounds for refusing confirmation or enforcement. As a result, this Court must confirm the Award.

## **PRAYER FOR RELIEF**

WHEREFORE, the Petitioner requests and prays that this Court issue an order as to the Award:

a.    Confirming the Award against all Respondents;

b.    Cancelling the Film Distribution Right Investment Contract entered into by and between the Petitioner and the Respondents on May 16, 2018;

c.   Respondent UCFTI and Respondent Chen should return the entire investment fund of USD 1.35 million to the Petitioner;

d.   Respondent UCFTI and Respondent Chen should pay an interest of USD 399,060 calculated from May 16, 2018, to September 18, 2019, to the Petitioner;

e.   Respondent UCFTI and Respondent Chen should pay an interest of USD 1,406,958.90 to the Petitioner based on USD 1.35 million according to the standard of annual interest rate of 20% from September 19, 2019, to December 2, 2024 (1902 days);

f.   Respondent UCFTI and Respondent Chen should pay Chinese Yuan or RMB 200,000 to the Petitioner to repay the Petitioner's expense for hiring a lawyer and Chinese Yuan or RMB 45,000 expense for temporary measures guarantee insurance;

g.   Respondent UCFTI and Respondent Chen should pay Chinese Yuan or RMB 148,779.33 to the Petitioner to make up the arbitration fee paid by the Petitioner for it in advance;

h.   Respondent Chen assumes limitless joint and several liabilities with Respondent UCFTI in regard to the funds that should be paid under the aforesaid orders.

Dated:  December 2, 2024                    **LAW OFFICES OF KAISHENG YANG**

By:_____
        Kaisheng Yang, Esq.
        Attorney for Petitioner
Beijing Shangye Film and Television Culture Media Co., Ltd.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

# 电影发行权投资合同

甲方：UCFTI, Inc.

地　　址：7083 Hollywood Blvd, 5th Floor, Los Angeles, CA 90028

联系人：Bianca Chen　（陈左虹）

联系电话：001-626-379-9926

电子邮箱：bianca@ucftiexpo.com

乙方：北京尚野影视文化传媒有限公司

地　　址：　北京市朝阳区北苑路 13 号院 1 号楼 B-1307

联系人：　伊岩

联系电话：　010-65088606

电子邮箱：　463180941@qq.com

　　甲乙双方确认，甲方为《Hostiles》《Dragged Across Concrete》《Fonzo》三部影片（以下简称"影片"）引进方，乙方决定参与影片的投资。双方特此就影片的投资、制作、宣传、发行以及收益分配等相关合作事宜，在公平、平等、自愿的基础上，经友好协商，依法签订本协议，以资共同遵守。

### 第一条　合作原则

　　1、　本协议的各项条款均遵守《中华人民共和国合同法》、《中华人民共和国著作权法》、《中华人民共和国著作权法实施条例》、《电影管理条例》及中国广电总局电影局对电影管理的有关规定。

　　2、双方保证各自完全拥有法律规定的权利和能力，依法签署本协议，并切实履行本协议项下各自的权利和义务。

3、双方确认，甲方拥有影片在中国地区（包括中国大陆、不包括香港特别行政区和台湾、澳门特别行政区）的复制权、发行权、放映权、广播权、出租权、信息网络传播权以及因任何未来出现之新的渠道和方式产生的权利（统称 **"发行权"**）；乙方作为甲方在中国的合作方，甲方授权乙方按投资比例获得中国大陆地区（**"发行区域"**）的发行权，包括但不限于以电影院、电视机、数字电视、IPTV、计算机、手机、机顶盒、DVD、MPEG4 播放器、车载电视、等电子设备为接收终端，通过互联网、移动通信网等局域或广域网络从事有线或无线的在线视、音频播放，下载视、音频文件、VOD 点播、直播、轮播、广播等活动的发行权等（轮船及航空除外）。经甲、乙双方达成一致意向，签署本电影发行权投资合同（ **"本合同"**）；

4、乙方做为投资方之一，投资影片在发行区域引进成本的【30%】，甲方授权乙方拥有影片在发行区域【30%】的发行权收益，约定如下，以遵信守。

### 第二条 影片基本信息

（一）影片

1、影片名称：《**敌对分子**》（暂定名，最终以中国国家新闻出版广电总局（以下简称 "广电总局"）颁发的 "电影片公映许可证" 上的片名为准，以下简称 "影片"）；

2、影片英文名称：【hostiles】 ；

3、出品国别：美国；

4、导演：【Scott Cooper】；

5、主要演员：Christian Bale/Rosamund Pike；

6、影片时长：88 分钟至 115 分钟

7、版本：2D

8、预计上映时间：暂定 2017 年 12 月（具体时间以电影审核相关部门核准的日期为准）

（二）影片

1、影片名称：《**逃出泥潭**》（暂定名，最终以中国国家新闻出版广电总局（以下简称 "广电总局"）颁发的 "电影片公映许可证" 上的片名为准，以下简称 "影片"）；

2、影片英文名称：【Dragged Across Concrete】 ；

3、出品国别：美国；

4、导演：【S.CraigZahler】；

5、主要演员：Mel Gibson/Vince Vaughn；

6、影片时长：88 分钟至 115 分钟

7、版本：2D

8、预计上映时间：暂定 2018 年 6 月（具体时间以电影审核相关部门核准的日期为准）


（三）影片

1、影片名称：《**方索**》（暂定名，最终以中国国家新闻出版广电总局（以下简称"广电总局"）颁发的"电影片公映许可证"上的片名为准，以下简称"影片"）；

2、影片英文名称：【**fonzo**】 ；

3、出品国别：美国；

4、导演：【Josh Trank】；

5、主要演员：Tom Hardy；

6、影片时长：88 分钟至 115 分钟

7、版本：2D

8、预计上映时间：暂定 2018 年 12 月（具体时间以电影审核相关部门核准的日期为准）


**第三条 投资协定**

1、甲乙双方确认：

影片在发行区域发行权的引进费用及相关资料费、保险费、公证费、运输费等费用及相关税费（统称"**引进成本**"）共计【**肆佰伍拾**】万美元（USD【□4,500,000.00】）。乙方对引进成本进行百分之三十（30%）的整体投资，投资总额共计【**壹佰叁拾伍**】万美元(USD【□1,350,000.00】)（"**投资总额**"），或等值人民币(以汇款当日汇率为准)

2、甲乙双方均有权在各自投资比例内引入第三方作为影片的联合投资方。一方引入第三方投资时，应自行解决新增投资方的投资款支付及权益和收益分配事宜，不得减损对方依据本合同所享有的权利。一方应尊重另一方的意愿，不引入与另一方存在核心利益冲突的第三方进行投

资。双方均不得以将影片版权质押或版权权益质押的方式引进第三方投资者。

3、投资总额的支付

双方同意，乙方按如下安排向甲方支付投资总额

（1）  双方签订合同后【5】个工作日内，乙方向甲方指定的账户支付投资总额的【50%】，

等值于【陆拾柒万伍仟】美元(USD【□675,000.00】)的人民币；

（2）  双方签订合同后【30】个工作日内，乙方向甲方指定的账户支付投资总额的【50%】，

等值于【陆拾柒万伍仟】美元(USD【□675,000.00】)的人民币；

（注：甲方需在乙方第二笔投资总额支付日期前，完成交付本合同约定任意一部影片的完片介质、版权链证明，如甲方不能按照如上要求交付，则乙方第二笔投资总额支付日期顺延，不承担违约责任)

4、甲方指定投资账户如下：

公司名称：  UCFTI, Inc.

开户行： ████████

银行名字：

████████████████

银行地址：

██████████████████████████████

银行电话：

████████████

公司名字：

████████████████

(美国境内汇款)银行代码

████████████████████

(国际汇款)银行代码

██████████████████

公司账号：

甲方指定乙方汇款之中国大陆地区账户信息如下：

公司名称：███████████
账号：███████████
开户行：███████████████████
大额行号：██████████

5、甲方同意于乙方付款后三个工作日内，向乙方出具同等付款金额的收据。

6、双方按照影片授权区域内相关税收法律、法规和政策规定自行承担各自取得的收入应缴纳之税款。

### 第四条　影片立项和送审

1、双方同意由甲方负责影片引进、进口指标获取，甲方负责执行影片的备案或立项、和送审的有关行政审批手续，获取广电总局颁发的《电影片公映许可证》，乙方应及时配合出具影片送审等所需申请文件。

2、甲方保存广电总局颁发的《电影片公映许可证》之正本，并向乙方提供复印件。

### 第五条　权利归属及保护

1. 甲乙双方均保证：有合法、完整的权利、资质及能力签署并履行本合同的约定；未签署或者受制于与本合同权利义务相冲突、矛盾的任何协议或文件；本合同的约定及履行，不会侵犯任何其他方的合法权利；除本合同约定的款项外，无需向任何其他方支付任何形式的费用。

2. 甲乙双方各自按照本合同约定享有影片在发行区域的全部发行收入（"收益权"），双方一致同意且甲方应确保，该收益权的期限为【17】年或甲方实际取得发行权的更长期限（二者中较长者，下称"发行期限"），如甲方实际取得发行权的期限超过 17 年，应立即以书面方式告知乙方，并向乙方提供相关材料。发行期限的起算日期为甲方在发行区域首次商业利用影片之日，或甲方另行确认并经乙方书面认可的日期。

3. 乙方应当按照本合同约定的投资比例、投资金额、支付时间及币种支付投资款项。若乙方无正当理由逾期未付，须每日向甲方按当期应付而未付款项的千分之三（3‰/日）支付滞

纳金；若逾期超过 15 个工作日，甲方有权单方面解除本合同。

4. 甲方应当按照本合同的约定及时向乙方提供 **"收益报告 "**（定义见下述），并按本合同约定按时与乙方结算收益，若甲方逾期未付，须每日向乙方按照应付款项的千分之三（3‰/日）支付滞纳金；若逾期超过 15 个工作日，乙方有权单方面解除本合同，乙方除要求甲方退还全部已支付款项外，并有权要求甲方赔偿损失。

5. 乙方有权引进其他第三方分担乙方的投资总额及收益权，但乙方应自行处理与其引进方之间的关系，与甲方和本合同无关，但乙方有义务向甲方报备，不视为转让在本合同下的权利义务，不据此影响双方在本合同下的权利义务关系。甲方有权与其他第三方就影片在发行区域的发行进行合作，但该合作不应影响乙方在本合同下的权利及影片的收益。


**第六条  影片宣传发行**

1. 双方一致同意，影片在发行区域由甲方或其指定方（指定方信息需事先书面告知乙方，以下与甲方统称 **"甲方宣发方"**）、乙方与大地时创电影发行（北京）有限公司联合发行（以上各方统称 **"联合发行方"**），发行收入包括但不限于发行区域的票房收入，以及影片在发行区域内行使信息网络传播权、放映权、广播权、音像制品复制权等以及以其他方式行使发行权取得的销售收入。

2. 影片在中国内地的宣传方案及发行预算，由甲方宣发方负责编制并经乙方书面确认后，与乙方、大地时创电影发行（北京）有限公司联合执行，宣发成本包括但不限于翻译、字幕费、宣传费、物料制作费及其他相关费用等（ **"宣发成本"**），宣发成本由甲乙双方另行确定，具体金额以双方加盖公章的宣发成本预算确认函中的约定为准。

3. 宣发成本不计入引进成本，双方一致同意，对于影片在发行区域的全部收益，宣发成本应作为第一序列的优先受偿款项。

4. 甲乙双方确认，在影片院线宣传活动期间，甲方应邀请乙方指定代表出席影片在发行区域或其他地区有关的大型宣传活动，并应提前【10】个工作日将宣传活动的计划和安排书面通知乙方。乙方有关人员参加宣传活动的开支（包括但不限于差旅费用、食宿费用以及其他一切必要合理开支）应包含在宣发成本中。

5. 甲乙双方同意，所有影片相关的宣发事务均由甲方与宣传及发行公司签订协议，协议签署前应征求并听取乙方的合理意见，需向乙方书面通知并获得同意，不得损害乙方基于本合同享有的或对于影片享有的任何权利，协议签署后【1】日内应向乙方提供签署版协议副本。

6. 甲方确定并承诺影片，单部宣发成本的上限为人民币【500】万元，乙方有权要求审核宣发预算的具体使用明细，甲方应按乙方要求及时提供使用明细的相应文件。

### 第七条 影片收益分配及结算

1. 影片的收益应包括（相关定义请见下述）：院线发行收入（包括发行代理费）、其他发行收益以及与影片相关的商务开发收入（不包含衍生品收入）、获奖收入、政府奖励及补贴收入以及除上述以外的任何其他收入（如有）。影片的票房分账方式如下：

    （1）总票房（本合同及影片所及的各系统的各种发行收入）=全国（即发行区域）各院线公司、影院等发行放映单位形成的原始票房总额（以国家电影专项资金管委会办公室确认的结算数据，或华夏电影发行有限责任公司或中国电影集团公司盖章版结算单为准）；

    （2）净票房收入=总票房-国家电影专项资金-实际所缴增值税及附加税费；（国家电影专项资金及各项税费将根据国家税务管理部门的规定依法缴纳，以上公式若由于政策原因发生变化，则届时按新的政策执行）。

    （3）院线发行收入=净票房收入-院线及影院分账（院线及影院分账比例应经甲乙双方共同确认）。

    （4）发行代理费=净票房收入×4%。

    （以上公式若发生政策变动，则按届时的规定执行）。

2. 联合发行方根据所垫付宣发成本的比例分配影片的发行代理费，该分配比例应当事先经得全体联合发行方书面确认。

3. 除发行代理费以外的院线发行收入，以及除院线发行收入以外的其他在发行区域的收益（包括但不限于向非院线的其他放映单位发行影片取得的发行收入、信息网络发行收入、广播电视发行收入、音像出版发行收入以及以前述方式以外的一切其他发行方式发行影片所取得的收入，统称 **"其他发行收益"**），以及与影片相关的商务开发收入（不包含衍生品收入）、获奖收入、政府奖励及补贴收入以及除上述以外的任何其他收入（如有），甲方与乙方按投资比例分配。

4. 结算：

    （1）甲乙双方分配所得的税金各自承担。甲方应确保影片的全部收益应统一支付至甲乙双方共同指定的共管账户。

    （2）甲方承诺【每月】的【10】日之前向乙方提供影片上个月的发行、销售收益报告（ **"收**

益报告"），若乙方对于收益报告的内容存在异议，甲方需向乙方合理说明并提供相应证明材料，若双方就异议内容仍不能达成一致，任意一方有权委托取得合法资质的第三方审计机构进行查验，由此产生的费用由事后查明的过错方承担，若双方均无过错，则由双方平摊。

（3）甲乙双方依据共同确认的收益报告，最迟于影片首映日起的第 3 个月的【10】日前，甲乙双方进行影片收益的统一结算，其后每 2 个月的同一日统一结算一次直至首映日后 1 年期届满。1 年届满后，每半年统一结算一次，直至发行期限届满。

（4）甲乙双方确认结算结果后十五个工作日内，甲方按照合同约定将乙方收益汇至乙方指定账户。若院线、被授权单位未与甲方结算或汇款，在事先告知乙方并经得乙方同意后，甲乙双方的结算确认和汇款相应顺延。甲方应在收到发行款项和完成结算确认后不得迟于十五个工作日内（以银行汇款日期为准）向乙方汇款，否则视为甲方违约。乙方须向甲方出具可供入账的正式发票。

（5）甲乙双方确认且甲方应确保，仅当甲乙双方回收影片相关的所有成本（包括但不限于引进成本和宣发成本）后，方可给予美国片方不高于院线发行收入的 50%，作为奖励，具体奖励金额由甲乙双方与美国片方另行商定。如乙方届时未能按本合同之约定回收所有成本并分配收益，除因不可抗力导致的情形外，甲方应当补足乙方基于本合同应予收回但未能收回的成本以及应当获得但未能获得的收益。

（此条约定的是甲方保证乙方投资及收益分配的安全性，并不是要求保证乙方投资成本保本）

乙方账户信息如下：

户名：  北京尚野影视文化传媒有限公司

纳税人识别号：███████████

开户行：███████████

账号：███████████

第八条 违约责任

1. 甲方的违约责任：如果甲方就本合同约定影片**《敌对分子》**于 2018 年 6 月前、**《逃出泥潭》**于 2018 年 8 月前、**《方案》**于 2018 年 12 月前，无法按本合同约定向乙方转让影片在发行区域相应比例的发行权并提供相应权利凭证，则乙方有权解除本合同，甲方应向乙方退还已经收取的全部投资款，并向乙方支付利息，标准是年利率 20%，计息期间自乙方支付投资款之日至实际向乙方完全退还之日止。

第 8 页 共 12 页

2. 如果甲方没有能够取得影片在本合同约定发行区域的发行权，或影片在发行区域的发行权因甲方原因被全部或部分撤销或收回，或因甲方原因导致乙方无法获取本合同项下的收益，或者如果甲方没有能够就本合同约定影片《敌对分子》于 2018 年 6 月前、《逃出泥潭》于 2018 年 10 月前、《方索》于 2019 年 3 月前，获取广电总局颁发的《电影片公映许可证》（即大陆地区商业院线上映权利，俗称"批片指标、上映许可证、龙标"）情况下，乙方有权就未获取广电总局颁发的《电影片公映许可证》的影片向甲方提出换片要求，并书面通知甲方，自通知送达之日起【15】个工作日内，甲方有义务提供新的甲方在本合同约定发行区域内有发行权的影片（下称"甲方新电影"）配合乙方进行一次电影影片调换工作，并承诺给予乙方的甲方新电影授权权利不得劣于本合同约定的影片授权权利，如乙方未能选中任何甲方新电影，或乙方选中的甲方新电影于【2020】年【1】月前仍无法获取广电总局颁发的《电影片公映许可证》，则乙方有权解除本合同，甲方应该赔偿乙方的全部投资款，并向乙方支付利息，标准是年利率 20%，计息期间自乙方支付投资款之日至甲方实际完全支付赔偿之日止。

3. 乙方的违约责任：乙方应该按本合同及时支付投资款，逾期按本合同第五条第 3 项承担违约责任。乙方有权与第三方分享投资与收益份额，但无权转让版权给任何第三方。

4. 除本合同另有约定外，如任何一方不履行、延迟履行本合同或其保证、承诺存在虚假，均视为违约行为并应承担违约责任，违约方应当于收到违约通知后【10】个工作日之内纠正，否则守约方可提出终止本合同，违约方需赔偿守约方造成的经济、名誉等损失及因此而引起之法律费用（包括但不限于直接损失以及律师费、公证费、差旅费、鉴定费等费用）。

### 第九条 保证与承诺

本合同的各方向本合同其他方做出如下保证和承诺,在本合同签订之日及履行过程中：

1、该方均有资格签署本合同并拥有履行本合同的能力。该方均由各自代表"自然人"作为担保人，由其个人各自为本公司履行本合同向另一方提供无限连带担保责任。

甲方担保人：Bianca Chen (Zuohong Chen/ 陈左虹)

姓名：Bianca Chen (Zuohong Chen/陈左虹)

护照号：███████

第 9 页 共 12 页

乙方担保人：伊岩

姓名：伊岩

身份证号：▮▮▮▮▮▮▮▮▮▮

护照号：▮▮▮▮▮▮

2、该方拥有签订和履行本合同所需的一切必要授权和批准，该方签订本合同或履行本合同项下义务不违背该方的章程、应遵守的任何有关行业和业务的法律、行政法规及规章，并已取得有关政府机关或组织的授权或批准（如需），本合同的签署和履行不与该方作为一方或受其约束的合同或协议的任何规定相抵触，亦不会因违反该等规定构成违约。

3、没有任何针对该方的、有关本合同标的、或在任何方面会影响该方签订或履行本合同能力的待决的诉讼、仲裁或法律、行政或其他程序或政府调查，并且该方所知范围内亦不存在前述情形的潜在风险。

**第十条 保密**

1、双方保证对在讨论、签订、执行本合同过程中所获悉的属于对方的且无法自公开渠道获得的文件及资料（包括商业秘密、公司计划、运营活动、财务信息、技术信息、经营信息等）予以保密。未经本合同其他方事先书面同意，任一方不得向任何第三方泄露。若一方违反本条所规定的保密义务的，应赔偿由此给本合同守约方造成的一切损失。

2、影片上映前，双方应对与影片相关的信息，包括但不限于电影剧本、大纲、演员、人物形象、道具、场景、制作进度、投资预算、经费支出等，承担保密义务。但经双方协商一致的，符合电影宣传方案和计划的信息披露方不视为违反保密义务。

3、保密条款长期有效，本协议终止后双方仍受约束。

**第十一条 不可抗力**

1、在本合同签署后，如发生双方于签署本合同时不能预见、不能避免、其后果无法克服

的客观事件（包括但不限于发生地震、台风水灾、火灾等重大自然事件以及战争、动乱、政府管制等社会事件），且该等客观事件的发生使得双方不能履行，不能全部履行或不能按期履行本合同时，则遭受不可抗力影响的一方可书面通知本合同其他方并说明原因，暂时中止本合同的履行。待该等不可抗力事件消除之日起，本合同继续履行。

2、如果不可抗力事件影响自其发生之日起持续三十（30）日仍未消除，则任何一方均有权以书面形式通知对方，终止或者解除本合同，而无须承担违约责任。

**第十二条 适用法律和争议解决**

1. 甲方和乙方履行本合同受中华人民共和国法律保护、管辖并按其解释。

2. 凡因本合同引起的或与本合同有关的任何争议，双方应本着公平公正、互谅互让的精神，友好协商以求解决。协商不成的，应向【北京仲裁委员会】提起仲裁，按照现行有效的仲裁规则在【北京】进行仲裁。

**第十三条 通知**

1、除非本合同或双方另有约定，本合同项下一方向另一方发出的通知应采用书面方式，采用下列方式发送至对方指定的通信地址、电子邮箱等接收系统（详见本合同文首列明的双方联系方式）。除非本合同另有约定，一方发出的书面通知于送达被通知方时生效。如无相反证据，应根据下述规定确定送达时间：以函件方式由专人送达或由邮寄、快递服务发送的，文件到达收件人指定通信地址时视为送达；以电子邮件等数据电文方式发送的，以数据电文进入收件人指定的信息系统时视为送达。

2、本合同履行过程中，一方指定通信地址、电子邮箱等联系方式变更的，应及时以书面方式通知对方。未通知对方的，视为未变更。

**第十四条 其他**

1、双方在本合同生效前签署的所有协议、意向书和备忘录等对双方具有约束力的法律文件，如与本合同有任何不一致，应以本合同为准。

2、本合同经甲乙双方盖章后生效。本合同一式肆份，甲乙双方各执贰份，每份具有同等

法律效力。

    3、双方的公司营业执照的复印件和担保人的护照复印件应作为必要的附件交给对方备案。

（以下无正文，为本协议签字页）

甲方：UCFTI, Inc.

（盖章）：

代表：Bianca Chen　（陈左虹）

签订日期：5-16-2018

乙方：　北京尚野影视文化传媒有限公司

（盖章）：

代表：伊岩

签订日期：

# Film Distribution Rights Investment Contract

Party A: **UCFTI, Inc.**

Address: 7083 Hollywood Blvd, 5th Floor, Los Angeles, CA 90028

Contact Person: Bianca Chen (Zuohong Chen)

Tel.: 001-626-379-9926

Email: bianca@ucftiexpo.com

**Party B: Beijing Shangye Film and Television Culture Media Co., Ltd.**

Address: B-1307, Building 1, No. 13, Beiyuan Road, Chaoyang District, Beijing

Contact Person: Yan Yi

Tel.: 010-65088606

Email: 463180941@qq.com

 

Party A and Party B confirm that Party A is the importer of the three films *Hostiles, Dragged Across Concrete*, and *Fonzo* (the "Films"), and Party B has decided to invest in the Films. The Parties hereby enter into this Film Distribution Rights Investment Contract ("this Contract") in accordance with the law on the basis of fairness, equity and free will, and after amicable negotiations, regarding the investment, production, publicity, distribution, revenue sharing and other related matters of cooperation for the Films, for their joint compliance.

### Article I Cooperation Principles

1. The terms and conditions of this Contract shall be governed by the *Contract Law of the People's Republic of China*, the *Copyright Law of the People's Republic of China*, the *Regulations for the Implementation of the Copyright Law of the People's Republic of China*, the *Regulations on the Administration of Films*, and the relevant regulations of the Film Bureau of the State Administration of Press, Publication, Radio, Film and Television of the People's Republic of China ("SAPPRFT") on the administration of films.

2. The Parties warrant that they each have the full rights and capacity prescribed by law to execute this Contract and will faithfully perform their respective rights and obligations hereunder.

3. The Parties confirm that Party A owns the copyright, distribution rights, screening rights, broadcasting rights, rental rights, information network dissemination rights, and rights arising from any new channels and methods that may emerge in the future (collectively, **"Distribution Rights"**) in the territory of China (including Mainland China, excluding the Hong Kong Special Administrative Region and Taiwan, and the Macao Special Administrative Region) for the Films; and Party B, as Party A's partner in China, is authorized by Party A to obtain the Distribution Rights in Mainland China (the **"Distribution Territory"**) in proportion to its investment, including, but not limited to, the Distribution Rights to engage in wired or wireless online video and audio streaming, download of video and audio

files, VOD, live streaming, broadcasting, and other activities via the Internet, mobile communication networks, and other local or wide area networks, using electronic devices such as movie theaters, televisions, digital televisions, IPTV, computers, mobile phones, set-top boxes, DVD players, MPEG4 players, and car televisions as receiving terminals (excluding ships and aircraft). The Parties have reached a consensus and signed this Film Distribution Rights Investment Contract.

4. Party B, as one of the investors, invests [30%] of the import costs of the Films in the Distribution Territory, and Party A authorizes Party B to receive [30%] of the Distribution Rights revenue for the Films in the Distribution Territory. The Parties agree as follows, which shall be faithfully observed.

**Article II Basic Information of the Films**
(I) Film
1. Title: *Hostiles* (tentative title, subject to the final title on the "Film Public Screening Permit" issued by the State Administration of Press, Publication, Radio, Film and Television of the People's Republic of China ("SAPPRFT"), "Film");
2. English Title: [**Hostiles**];
3. Country of Origin: United States;
4. Director: [Scott Cooper];
5. Starring: Christian Bale/Rosamund Pike;
6. Duration: 88 minutes to 115 minutes;
7. Version: 2D;
8. Estimated Release Date: December 2017 (tentative, subject to the approval of the relevant film censorship authorities);

(II) Film
1. Title: *Dragged Across Concrete* (tentative title, subject to the final title on the Film Public Screening Permit issued by the State Administration of Press, Publication, Radio, Film and Television of the People's Republic of China ("SAPPRFT"), "Film");
2. English Title: [**Dragged Across Concrete**];
3. Country of Origin: United States;
4. Director: [S. Craig Zahler];
5. Starring: Mel Gibson/Vince Vaughn;
6. Duration: 88 minutes to 115 minutes;
7. Version: 2D;
8. Estimated Release Date: June 2018 (tentative, subject to the approval of the relevant film censorship authorities);

(III) Film
Title: *Fonzo* (tentative title, subject to the final title on the Film Public Screening Permit issued by the State Administration of Press, Publication, Radio, Film and Television of the People's Republic of China ("SAPPRFT"), "Film");
2. English Title: [Fonzo];
3. Country of Origin: United States;
4. Director: [Josh Trank];
5. Starring: Tom Hardy;
6. Duration: 88 minutes to 115 minutes;
7. Version: 2D;
8. Estimated Release Date: December 2018 (tentative, subject to the approval of the relevant film censorship authorities);

### Article III Investment Agreement

1. The Parties confirm that:

The total import costs, including fees for related materials, insurance, notarization, transportation, and relevant taxes and fees (collectively, the **"Import Costs"**) for the Distribution Rights of the Films in the Distribution Territory amount to [Four Million and Five Hundred Thousand] US Dollars (USD[□4,500,000.00]). Party B shall make a total investment of thirty percent (30%) of the Import Costs, with a total investment amount of [One Million Three Hundred and Fifty Thousand] US Dollars (USD [□1,350,000.00]) (the **"Total Investment Amount"**), or the equivalent amount in RMB (based on the exchange rate on the date of remittance).

2. The Parties shall be entitled to introduce a third party as a joint investor for the Films within their respective investment proportions. When introducing a third party investor, a party shall independently resolve matters related to the payment of investment funds, equity and revenue sharing for the new investor, and shall not impair the other party's rights under this Contract. A party shall respect the wishes of the other party and shall not introduce a third party investor that has a core conflict of interest with the other party. Neither party shall introduce a third party investor by pledging the copyright of the Films or the copyright interests.

3. Payment of the Total Investment Amount

The Parties agree that Party B shall pay the Total Investment Amount to Party A as follows:

(1) Within [5] working days after the execution of this Contract, Party B shall pay [50%] of the Total Investment Amount, equivalent to [Six Hundred and Seventy-Five Thousand] US Dollars (USD [□675,000.00]) in RMB, to the account designated by Party A;

(2) Within [30] working days after the execution of this Contract, Party B shall pay [50%] of the Total Investment Amount, equivalent to [Six Hundred and Seventy-Five Thousand] US Dollars (USD [□ 675,000.00]) in RMB, to the account designated by Party A.

(Note: Party A shall, before the second payment date for the Total Investment Amount by Party B, complete the delivery of the complete film media and proof of copyright chain for any one of the Films as stipulated herein. If Party A fails to deliver as required above, the second payment date for the Total Investment Amount by Party B shall be postponed accordingly, and Party B shall not be liable for breach).

4. Party A designates the following account for receiving investment funds:
Company Name: UCFTI, Inc.
Bank: ███████
Bank Name: ████████
Bank Address: ████████████████████████U.S.A
Bank Phone: ██████████
Company Name: UCFTI, Inc.
68(Domestic Wire) Routing Number: ████████
(International Wire) SWIFT Code: █████████
Account Number: ████████
Party A designates the following account in Mainland China for receiving remittance from Party B:
██████████
Company Name: ████████████████
Account No.: ████████
Bank: ████████████████████████
Sub-Branch)
CNAPS Code: ██████████

5. Party A agrees to issue a receipt for the same amount of payment to Party B within three working days after receiving payment from Party B.

6. The Parties shall each bear the taxes payable on their respective income in accordance with the

applicable tax laws, regulations and policies in the authorized territory of the Films.

### Article IV Film Approval and Censorship

1. The Parties agree that Party A shall be responsible for the import of the Films and obtaining the import quota, and Party A shall be responsible for carrying out the necessary administrative approval procedures for the registration or filing and censorship of the Films, and obtaining the *Film Public Screening Permit* issued by SAPPRFT. Party B shall provide timely cooperation in providing the application documents required for the censorship of the Films.

2. Party A shall keep the original of the *Film Public Screening Permit* issued by SAPPRFT and provide a copy to Party B.

### Article V Ownership and Protection of Rights

1. Each party warrants that it has the legal, complete rights, qualifications, and capacity to execute and perform this Contract; has not executed or is not subject to any agreement or document that conflicts or contradicts with the rights and obligations of this Contract; the terms of this Contract and the performance thereof will not infringe upon the legitimate rights of any other party; and no payment of any kind is required to be made to any other party except for the amounts as stipulated herein.

2. Each party shall enjoy all distribution revenue (the **"Revenue Rights"**) for the Films in the Distribution Territory in accordance with this Contract. The Parties agree, and Party A shall ensure, that the term of the Revenue Rights shall be **[17]** years or the longer term of Party A's actual acquisition of the Distribution Rights (the **"Distribution Term"**). If the term of Party A's actual acquisition of the Distribution Rights exceeds 17 years, Party A shall immediately inform Party B in writing and provide relevant materials to Party B. The Distribution Term shall commence on the date of Party A's first commercial exploitation of the Films in the Distribution Territory, or on such other date as may be determined by Party A and approved by Party B in writing.

3. Party B shall pay the investment funds in accordance with the investment proportion, investment amount, payment time, and currency as stipulated herein. If Party B fails to make payment on time without justifiable reasons, it shall pay liquidated damages to Party A at the rate of three thousandths (3‰/day) of the overdue amount per day; if the delay exceeds 15 working days, Party A shall be entitled to unilaterally rescind this Contract.

4. Party A shall timely provide Party B with **the "Revenue Report"** (as defined below) in accordance with this Contract and shall timely settle the revenue with Party B in accordance with this Contract. If Party A fails to make payment on time, it shall pay liquidated damages to Party B at the rate of three thousandths (3‰/day) of the overdue amount per day; if the delay exceeds 15 working days, Party B shall be entitled to unilaterally rescind this Contract. Party B, in addition to demanding that Party A refund all paid funds, shall also be entitled to demand that Party A compensate for its losses.

5. Party B shall be entitled to introduce other third parties to share its Total Investment Amount and Revenue Rights, but Party B shall handle the relationship with the introduced parties independently, which shall be unrelated to Party A and this Contract. However, Party B shall be obligated to report to Party A. This shall not be deemed as an assignment of the rights and obligations under this Contract, and shall not affect the relationship of rights and obligations of the Parties under this Contract. Party A shall be entitled to cooperate with other third parties in the distribution of the Films in the Distribution Territory, but such cooperation shall not affect Party B's rights under this Contract and the revenue of the Films.

### Article VI Publicity and Distribution of the Films

1. The Parties agree that the Films shall be jointly distributed in the Distribution Territory by Party A or its designee (information on the designee shall be provided to Party B in writing in advance, collectively, **"Party A's Distributor"**), Party B, and Dadi Times Film Distribution (Beijing) Co., Ltd. (collectively, the **"Joint Distributors"**). The distribution revenue shall include, but not be limited to, the

box office revenue in the Distribution Territory, as well as the sales revenue obtained from exercising the information network dissemination rights, screening rights, broadcasting rights, and audio-visual product reproduction rights within the Distribution Territory and from exercising the Distribution Rights in other ways.

2. The publicity plan and distribution budget for the Films in Mainland China shall be prepared by Party A's Distributor and confirmed in writing by Party B, and shall be jointly implemented by Party B and Dadi Times Film Distribution (Beijing) Co., Ltd. The publicity and distribution costs shall include, but not be limited to, translation, subtitling fees, publicity fees, material production fees, and other related fees (the "**Publicity and Distribution Costs**"). The Publicity and Distribution Costs shall be determined separately by the Parties. The specific amount shall be subject to the agreement in the Publicity and Distribution Costs Budget Confirmation Letter signed and sealed by the Parties.

3. The Publicity and Distribution Costs shall not be included in the Import Costs. The Parties agree that the Publicity and Distribution Costs shall be the first priority payment from all revenue of the Films in the Distribution Territory.

4. The Parties confirm that during the publicity activities in theaters, Party A shall invite Party B's designated representatives to attend major publicity activities related to the Films in the Distribution Territory or other regions, and shall notify Party B in writing of the plans and arrangements for the publicity activities at least [10] working days in advance. The expenses (including, but not limited to, travel expenses, accommodation and food expenses, and all other necessary and reasonable expenses) of Party B's personnel participating in the publicity activities shall be included in the Publicity and Distribution Costs.

5. The Parties agree that all publicity and distribution matters related to the Films shall be agreed upon by Party A and the publicity and distribution company. Before signing the agreement, Party A shall solicit and listen to Party B's reasonable opinions, and shall notify Party B in writing and obtain Party B's consent. Party A shall not impair any of Party B's rights under this Contract or in the Films. Within [1] day after the signing of the agreement, Party A shall provide Party B with a copy of the signed agreement.

6. Party A shall determine and commit that the upper limit of the Publicity and Distribution Costs for each film shall be RMB [5 million]. Party B shall be entitled to review the specific details of the use of the Publicity and Distribution Costs budget, and Party A shall provide Party B with the relevant documents detailing the use of the budget as requested.

### Article VII Revenue Sharing and Settlement for the Films

1. The revenue of the Films shall include (please refer to the relevant definitions below): theatrical distribution revenue (including distribution agency fees), other distribution revenue, and business development revenue related to the Films (excluding derivative product revenue), award revenue, government subsidies and incentive payments, and any other revenue (if any). The box office revenue sharing method for the Films is as follows:

(1) Total Box Office (all distribution revenue of this Contract and the Films for all systems) = the total original box office revenue generated by all theater chains, theaters, and other distribution and screening entities nationwide (i.e., in the Distribution Territory) (subject to the settlement data confirmed by the Office of the National Film Industry Development Special Fund Management Committee, or the settlement statement stamped by Huaxia Film Distribution Co., Ltd. or China Film Group Corporation);

(2) Net Box Office Revenue = Total Box Office - National Film Special Fund - Actual Value-Added Tax and Surcharges Paid (the National Film Special Fund and all taxes and fees shall be paid in accordance with the relevant regulations of the national tax administration authorities; if the above formula is changed due to policy reasons, it shall be implemented in accordance with the new policies at that time).

(3) Theatrical Distribution Revenue = Net Box Office Revenue - Theater Chain and Theater Share (the theater chain and theater share proportion shall be jointly confirmed by the Parties).

(4) Distribution Agency Fee = Net Box Office Revenue × 4%.

(If the above formula is changed due to policy reasons, it shall be implemented in accordance with

the regulations in force at that time).

2. The Joint Distributors shall share the distribution agency fee in proportion to the Publicity and Distribution Costs advanced by them, and such sharing proportion shall be confirmed in writing by all Joint Distributors in advance.

3. Party A and Party B shall share the theatrical distribution revenue excluding the distribution agency fee, and other revenue in the Distribution Territory excluding the theatrical distribution revenue (including, but not limited to, the distribution revenue obtained from distributing the Films to other screening entities other than theaters, information network distribution revenue, radio and television distribution revenue, audio-visual publication and distribution revenue, and the revenue obtained from distributing the Films by all other distribution methods other than the aforementioned methods, collectively, **"Other Distribution Revenue"**), as well as business development revenue related to the Films (excluding derivative product revenue), award revenue, government subsidies and incentive payments, and any other revenue (if any), in proportion to their investment.

4. Settlement:

(1) The Parties shall each bear the taxes payable on their respective share of the revenue. Party A shall ensure that all revenue of the Films is uniformly paid into the joint account designated by the Parties.

(2) Party A undertakes to provide Party B with the distribution and sales revenue report (**"Revenue Report"**) for the Films for the previous month before the [10th] day of [each month]. If Party B has any objection to the contents of the Revenue Report, Party A shall provide Party B with reasonable explanations and supporting materials. If the Parties still fail to reach a consensus on the contents of the objection, either party shall be entitled to entrust a qualified third party audit firm to conduct an inspection, and the costs incurred shall be borne by the party found to be at fault after the inspection; if neither party is at fault, the costs shall be shared equally by the Parties.

(3) Based on the Revenue Report jointly confirmed by the Parties, the Parties shall settle the revenue of the Films uniformly no later than the [10th] day of the 3rd month after the first day of release of the Films, and then every 2 months on the same date until the expiration of 1 year after the first day of release. After the expiration of 1 year, the revenue shall be settled uniformly every six months until the expiration of the Distribution Term.

(4) Within fifteen working days after the Parties confirm the settlement results, Party A shall remit Party B's share of revenue to the account designated by Party B in accordance with this Contract. If the theater chains or authorized entities fail to settle or remit funds to Party A, the settlement confirmation and remittance between the Parties shall be postponed accordingly after Party A informs Party B in advance and obtains Party B's consent. Party A shall remit funds to Party B no later than fifteen working days (subject to the date of bank remittance) after receiving the distribution funds and completing the settlement confirmation, failing which Party A shall be deemed to be in breach. Party B shall issue a formal invoice to Party A for accounting purposes.

(5) The Parties confirm, and Party A shall ensure, that a bonus of no more than 50% of the theatrical distribution revenue shall be given to the US film producer only after the Parties recover all costs related to the Films (including, but not limited to, the Import Costs and the Publicity and Distribution Costs). The specific bonus amount shall be negotiated separately by the Parties and the US film producer. If Party B fails to recover all costs and distribute revenue as stipulated herein at that time, Party A shall, except in cases of force majeure, make up for Party B's costs and revenue that should have been recovered but not recovered, and that should have been received but not received under this Contract.

**(This clause is to ensure the security of Party B's investment and revenue sharing, and is not a requirement to guarantee the return of Party B's investment costs.)**

Party B's account information is as follows:

Account Name: Beijing Shangye Film and Television Culture Media Co., Ltd.

Taxpayer Identification Number: ███████████████

Bank: ████████████████████████

Account No.: ███████████████

**Article VIII Liability for Breach**

1. Party A's liability for breach: If Party A fails to transfer the corresponding proportion of Distribution Rights for the Films in the Distribution Territory and provide the corresponding right certificates to Party B by June 2018 for ***Hostiles,*** by August 2018 for ***Dragged Across Concrete,*** and by December 2018 for ***Fonzo*** as stipulated herein, Party B shall be entitled to rescind this Contract. In this case, Party A shall refund all investment funds received to Party B and pay interest to Party B at an annual rate of 20%, calculated from the date on which Party B paid the investment funds to the date on which Party A fully refunds them to Party B.

2. If Party A fails to obtain the Distribution Rights for the Films in the Distribution Territory as stipulated herein, or if the Distribution Rights for the Films in the Distribution Territory are revoked or withdrawn in whole or in part due to reasons attributable to Party A, or if Party B is unable to obtain the revenue under this Contract due to reasons attributable to Party A, or if Party A fails to obtain the *Film Public Screening Permit* issued by SAPPRFT (i.e., the right for commercial theatrical release in Mainland China, commonly known as "quota for imported films", "screening permit" or "dragon mark") by June 2018 for ***Hostiles***, by October 2018 for ***Dragged Across Concrete***, and by March 2019 for ***Fonzo***, as stipulated in this Contract, Party B shall be entitled to request a film replacement from Party A for the Films that have not obtained the *Film Public Screening Permit* issued by SAPPRFT, and notify Party A in writing. Within [15] working days from the date of service of the notice, Party A shall be obligated to provide a new film for which Party A has Distribution Rights in the Distribution Territory stipulated in this Contract ("Party A's New Film") to cooperate with Party B in a film replacement. Party A shall undertake that the authorized rights for Party A's New Film granted to Party B shall not be inferior to the authorized rights for the Films as stipulated herein. If Party B fails to select any of Party A's New Films, or if the selected Party A's New Film still fails to obtain the *Film Public Screening Permit* issued by SAPPRFT by [January] [2020], Party B shall be entitled to rescind this Contract, and Party A shall compensate Party B for all investment funds and pay interest to Party B at an annual rate of 20%, calculated from the date on which Party B paid the investment funds to the date on which Party A actually makes full compensation.

3. Party B's liabilities for breach: Party B shall pay the investment funds on time in accordance with this Contract. If Party B fails to make payment on time, it shall bear the liability for breach in accordance with Article 5.3 hereof. Party B shall be entitled to share its investment and revenue share with a third party, but does not have the right to transfer the copyright to any third party.

4. Unless otherwise provided for herein, if any party fails to perform, delays in performing, or makes any false representation or warranty under this Contract, it shall be deemed to be in breach and shall bear the liability for breach. The breaching party shall remedy the breach within [10] working days after receiving the notice of breach, failing which the non-breaching party may terminate this Contract, and the breaching party shall compensate the non-breaching party for the economic and reputational losses caused and the legal fees incurred (including, but not limited to, direct losses, attorney fees, notary fees, travel expenses, and appraisal fees).

**Article IX Warranties and Undertakings**

Each party to this Contract hereby makes the following warranties and undertakings to the other party to this Contract on the date of execution of this Contract and during the performance of this Contract:

1. Such party is qualified to execute this Contract and has the capacity to perform this Contract. Each party shall have its respective representative "natural person" as guarantor, who shall provide unlimited joint and several guarantee liability to the other party for the performance of this Contract by the company.

Guarantor for Party A: Bianca Chen (Zuohong Chen)

Name: Bianca Chen (Zuohong Chen)

Passport No.: ████████

Guarantor for Party B: Yan Yi

Name: Yan Yi

ID Card No.: ████████

Passport No.: ████████

2. Such party has all necessary authorizations and approvals required to execute and perform this Contract. The execution of this Contract or the performance of any obligations hereunder by such party does not violate its articles of association, any applicable laws, administrative regulations and rules relating to the industry and business, and such party has obtained the authorization or approval of the relevant government authorities or organizations (if required). The execution and performance of this Contract does not conflict with any provision of any contract or agreement to which such party is a party or is bound, and will not constitute a breach due to violation of such provisions.

3. There are no pending lawsuits, arbitrations, or legal, administrative, or other proceedings or government investigations against such party relating to the subject matter of this Contract or that would in any way affect such party's ability to execute or perform this Contract, and to the best of such party's knowledge, there is no potential risk of the foregoing.

**Article X Confidentiality**

1. The Parties undertake to keep confidential any documents and materials (including, but not limited to, trade secrets, company plans, operational activities, financial information, technical information, and business information) belonging to the other party and not obtainable from public sources that they become aware of in the course of discussing, executing, and performing this Contract. Neither party shall disclose such information to any third party without the prior written consent of the other party. If a party breaches its confidentiality obligations under this Article, it shall compensate the non-breaching party for all losses caused thereby.

2. Before the release of the Films, the Parties shall maintain confidentiality with respect to information related to the Films, including, but not limited to, the film scripts, outlines, actors, character images, props, scenes, production progress, investment budget, and expenses. However, the disclosure of information that is agreed upon by the Parties and is consistent with the film publicity plan shall not be deemed as a breach of confidentiality obligations.

3. The confidentiality provisions shall be valid for a long term and shall continue to bind the Parties after the termination of this Contract.

**Article XI Force Majeure**

1. If, after the execution of this Contract, any objective event occurs that was unforeseeable and unavoidable at the time of execution of this Contract, and the consequences of which cannot be overcome (including, but not limited to, major natural events such as earthquakes, typhoons, floods, and fires, as well as social events such as war, unrest, and government control), and such objective event makes it impossible for the Parties to perform this Contract, to perform this Contract in full, or to perform this Contract on time, the party affected by the force majeure event may notify the other party in writing and explain the reasons, and temporarily suspend the performance of this Contract. This Contract shall

continue to be performed upon the elimination of such force majeure event.

2. If the force majeure event continues for thirty (30) days from the date of its occurrence and has not been eliminated, either party shall be entitled to notify the other party in writing to terminate or rescind this Contract without being liable for breach.

### Article XII Governing Law and Dispute Resolution

1. The performance of this Contract by the Parties shall be governed by, subject to, and construed in accordance with the laws of the People's Republic of China.

2. Any dispute arising out of or in connection with this Contract shall be settled amicably through negotiation between the Parties in the spirit of fairness, justice, mutual understanding and mutual accommodation. If the dispute cannot be settled through amicable negotiation, it shall be submitted to the [Beijing Arbitration Commission] for arbitration, and the arbitration shall be conducted in [Beijing] in accordance with the arbitration rules in force at that time.

### Article XIII Notices

1. Unless otherwise agreed in this Contract or by the Parties, any notice given by one party to the other party under this Contract shall be in writing and shall be sent to the other party's designated mailing address, email address, or other receiving system (as detailed in the contact information of the Parties first set forth above) by the following means: Unless otherwise provided for herein, a written notice given by a party shall take effect upon delivery to the notified party. In the absence of evidence to the contrary, the time of service shall be determined as follows: if delivered in person or sent by mail or express delivery service, the document shall be deemed to have been served when it reaches the recipient's designated mailing address; if sent electronically, such as by email, the document shall be deemed to have been served when it enters the recipient's designated information system.

2. If a party changes its designated mailing address, email address, or other contact information during the performance of this Contract, it shall promptly notify the other party in writing. Failure to notify the other party shall be deemed as no change.

### Article XIV Miscellaneous

1. If any agreement, letter of intent, memorandum, or other legally binding document executed by the Parties prior to the effective date of this Contract is inconsistent with this Contract, this Contract shall prevail.

2. This Contract shall take effect upon the Parties affixing their seals thereto. This Contract is made in four (4) originals, with each party holding two (2) originals, each of which shall have equal legal effect.

3. Copies of the Parties' business licenses and the guarantors' passports shall be submitted to the other party for record.

(The following pages are left blank intentionally for signatures)

**Party A: UCFTI, Inc.**

(Seal):

**By: Bianca Chen (Zuohong Chen)**



签订日期: 5-16-2018

**Signed on: 5-16-2018**

**Party B: Beijing Shangye Film and Television Culture Media Co., Ltd.**

(Seal):

北京尚野影视文化传媒

甲方:

伊岩

日期:

Beijing Shangye Film and Television Culture Media Co., Ltd.
Contract Seal
1101051114173

**By: Yan Yi**

**Signed on:**





# 营业执照 (副本)

统一社会信用代码 91440300788349389W

名　　　称　深圳市欧得宝翻译有限公司

类　　　型　有限责任公司

住　　　所　深圳市罗湖区宝安南路2014号振业大厦A座
　　　　　　 15D#

法定代表人　黄荣发

成立日期　　2006年05月12日

重
要　
提
示

1、商事主体的经营范围由章程确定。经营范围中属于法律、法规规定应当经批准的项目，取得许可审批文件后方可开展相关经营活动。
2、商事主体经营范围和许可审批项目等有关事项及年报信息和其他信用信息，请登录深圳市市场和质量监督管理委员会商事主体信用信息公示平台（网址http://www.szcredit.org.cn）或扫描执照的二维码查询。
3、商事主体须于每年1月1日—6月30日向商事登记机关提交上一年度的年度报告。商事主体应当按照《企业信息公示暂行条例》等规定向社会公示商事主体信息。



此证件仅供本公司为 _____
公司/个人提供资质证明使用

登记机关

2018 年 1 月 8 日



中华人民共和国国家工商行政管理总局监制



# Business License (Duplicate)

**Unified Social Credit Code: 91440300788349389W**

**Company Name:** Shenzhen ODB Translation Co., Ltd.

**Type of Business:** Limited Liability Company

**Place of Business**: 15D#, Block A, Zhenye Building, No. 2014 Bao'an Road South, Luohu District, Shenzhen

**Legal Representative:** Huang Rongfa

**Date of Incorporation:** May 12, 2006

| | |
|---|---|
| **Important Notes** | 1. Business scope of the commercial subject is determined by its articles of association. Any item as specified in the business scope and requiring examination and approval as stipulated by laws and regulations cannot be engaged until all required approval documents have been granted.<br>2. In terms of business scope, licensed and approved business items of the commercial subject as well as its annual financial reports and other credit information, please visit the commercial subject credit information publicity platform provided by the Market and Quality Supervision Commission of Shenzhen Municipality (http://www.szcredit.com.cn) or scan QR Code as below for query.<br>3. The commercial subject should submit its annual report for the previous year to its business registration authorities from January 1st to June 30th of every year. The commercial subject should disclose its information to the society in accordance with the provisions of the *Interim Regulation on Enterprise Information Disclosure*. |



Seal: Market Supervision Administration Bureau of Shenzhen Municipality

**Registration Authority:**

**November 08, 2018**

Made and Supervised by the State Administration for Industry & Commerce of the People's Republic of China



# 质量管理体系认证证书



**证书号：46622Q1011586R0S**

**兹证明**

## 深圳市欧得宝翻译有限公司

**统一社会信用代码：91440300788349389W**

注册地址：深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

经营地址：广东省深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

**建立的管理体系符合**

## GB/T19001-2016 /ISO9001:2015

**认证范围**

翻译服务

**颁证日期：** 2022 年 03 月 30 日
**有效日期：** 2025 年 03 月 29 日

在国家规定的各行政、资质许可范围内及有效期内使用有效，获证组织在证书有效期内需按期接受监督审核，监督审核合格后使用有效，本证书信息可在国家认证认可监督管理委员会官方网站（www.cnca.gov.cn）上查询。



签发人： 



## 深圳市中鑫认证检测有限公司

地址：深圳市福田区园岭街道八卦四路 2 号先科机电大厦 401-B-5A

网址：www.szccqc.cn    电话：0755-86568634





# QUALITY MANAGEMENT SYSTEM CERTIFICATE

**Certificate No.: 46622Q1011586R0S**

This is to certify that management system of

## Shenzhen ODB Translation Co., Ltd.

Unified social credit code: 91440300788349389W

Registered Address: 15/D,Block A,Zhenye Building, South Baoan Road, Luohu District,Shenzhen

Business Address: 15/D,Block A,Zhenye Building, South Baoan Road, Luohu District,Shenzhen

**Management system in line with:**

## GB/T19001-2016 /ISO9001:2015

**Scope of certification:**

Translation Services

**Date of issue:** March 30, 2022
**Date of expire :** March 29, 2025



It is valid for use within the scope of administrative and qualification permission and the period of validity stipulated by the state. The certificated organization shall be subject to supervision and audit on schedule within the period of validity of the certificate. It is valid for use after passing the supervision and audit. The information of this certificate can be found on the official website of the national certification and Accreditation Administration ( www.cnca.gov.cn ) Inquiry.

 General manager. 

### Shenzhen Zhongxin certification testing Co., Ltd

Address: 401-b-5a, Xianke electromechanical building, baguasi Road, Futian District, Shenzhen
Website: www.szccqc.cn      Telephone: 0755-86568634



中 国 翻 译 协 会

会 员 证 书

会员类别：单位会员

会员名称：深圳市欧得宝翻译有限公司

颁发时间：2020 年 12 月

统一编号：DD170819

中国翻译协会

2020 年 12 月 21 日

（有效期至 2022 年 12 月 31 日）



# 国际标准认证证书

**标准：** GB/T19001-2016 idt ISO9001:2015

**证书登记号：** UKS001-2019Q0255

**兹证明：**

**证书持有者：** 深圳市欧得宝翻译有限公司

组织机构（信用）代码:9144030078834989389W

注册地址：深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

经营地址：深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

**认证范围：** 翻译服务

通过优卡斯国际认证（深圳）有限公司现场审核，
证明满足了 GB/T19001-2016 idt ISO9001:2015 标准的要求

**有效期：** 本次发证日期：2021 年 04 月 02 日

本次有效日期：2022 年 04 月 11 日

首次注册日期：2019 年 04 月 12 日　　　　　注册有效日期：2022 年 04 月 11 日





**UKS**

CNCA-R-2016-268

本证书由优卡斯国际认证（深圳）有限公司注册颁发;获证组织应于证书有效期前按规定执行监督审核并更换本证书;
认证资格是否有效应登陆优卡斯国际认证（深圳）有限公司官方网站www.uks-sz.com查询证书信息;
亦可在国家认证认可监督管理委员会官方网站（www.cnca.gov.cn）上查询。

地址：深圳市宝安区西乡街道西部国际珠宝城创意研发大厦B座702室　　　邮编：518101

# Translators Association of China

## Certificate of Member

Category of Member: Entity Member

Member Name: Shenzhen ODB Translation Co., Ltd.

Issue Time: December 2020

Uniform Number: DD170819

Translators Association of China
December 21, 2020
(Valid to December 31, 2022)
Translators Association of China (Seal)



# INTERNATIONAL STANDARD CERTIFICATION

**standard:** GB/T19001-2016 idt ISO9001:2015

**Certificate registration number:** UKS001-2019Q0255

**It is hereby certified:**

**Certificate holder :** Shenzhen ODB Translation Co., Ltd.

Organization (credit) code : 91440300788349389W

Registered address : 15/D, Block A, Zhenye Building, South Baoan Road, Luohu District, Shenzhen

Business Address : 15/D, Block A, Zhenye Building, South Baoan Road, Luohu District, Shenzhen

**Certification scope :** Translation Services

Through UKS International Certification (Shenzhen) Co., Ltd on-site audit, Proof to meet the requirements of the GB/T19001-2016 idt ISO9001:2015 standard

**Valid period :**

Issued   date : April 2, 2021
Effective date：April 11, 2022

First registration date : April 12, 2019

Registration valid date : April 11, 2022



CNCA-R-2016-268





This certificate shall be issued by UKS International Certification (Shenzhen) Co., Ltd.; the certified organization shall, within the effective date of the certificate, perform the supervision and examination and replace the certificate;Whether the certification is valid or not. Please visit the official website at www.uks-sz.com.lt can also be found on the official website of the National Certification and Accreditation Administration (www.cnca.gov.cn).

Address: Room 702, building B, creative r&d building, west international jewelry city, xixiang street, bao 'an district, shenzhen Postcode: 518101



*ata*

THE AMERICAN TRANSLATORS ASSOCIATION
Founded in 1959

*Oudebao Translation Company*

subscribes to the

ATA Code of Professional Conduct and Business Practices

and is herewith granted this

Certificate of
Corporate
Membership

since
2011

Nicholas Hartmann
President

Virginia Perez-Santalla
Secretary

This certificate is valid only in combination with a membership card in good standing in the American Translators Association.

**EXHIBIT B**

PETITION TO CONFIRM AND ENFORCE FOREIGN ARBITRATION AWARD AGAINST RESPONDENTS

北京仲裁委员会/北京国际仲裁中心

（2019）京仲案字第 5573 号仲裁案

---

北京尚野影视文化传媒有限公司

（申请人）

与

UCFTI, Inc.（美中影视产业博览会）

（被申请人一）

陈左虹（CHEN ZUOHONG/BIANCA CHEN）

（被申请人二）

---

# 仲裁裁决书

（2021）京仲裁字第 4271 号

（根据自 2019 年 9 月 1 日起施行的《北京仲裁委员会仲裁规则》作出）

---

仲裁庭：陈希佳（首席）、王雪华、刘承韪

仲裁地：中国北京

2021 年 12 月 7 日

目　录

一、简介 ............................................................................................................... 1

　　（一）当事人 ................................................................................................... 1

　　（二）仲裁庭 ................................................................................................... 2

　　（三）本案合同 ............................................................................................... 2

　　（四）仲裁条款 ............................................................................................... 2

　　（五）适用规则 ............................................................................................... 3

　　（六）适用法律 ............................................................................................... 3

　　（七）仲裁地 ................................................................................................... 3

　　（八）仲裁语言 ............................................................................................... 3

二、仲裁程序概述 ............................................................................................... 4

三、案件事实概述 ............................................................................................... 7

四、当事人的仲裁请求及主张 ........................................................................... 7

　　（一）申请人的仲裁请求及主张 ................................................................... 7

　　（二）被申请人一的答辩 ............................................................................... 9

　　（三）双方提交的证据 ................................................................................... 9

　　　　申请人的证据 ........................................................................................... 9

五、仲裁庭意见 ................................................................................................. 10

　　（一）有关本案合同的效力 ......................................................................... 10

　　（二）有关申请人的仲裁请求 ..................................................................... 10

　　（三）有关本案仲裁费用及其他费用 ......................................................... 12

六、裁决 ............................................................................................................. 12

一、简介

（一）当事人

1. 本仲裁案当事人包括：

2. **北京尚野影视文化传媒有限公司**，一家根据中华人民共和国法律注册成立的有限责任公司，以下简称为"**申请人**"。

住所：中国北京市朝阳区北苑路 13 号院 1 号楼 13 层 B 单元 1307 号内 1

联系地址：中国北京市朝阳区北苑路 13 号院 1 号楼 B-1307

法定代表人：伊岩

申请人在本案中的代理人为：

北京大成律师事务所：石宛林 律师，袁萌 律师

地址：中国北京市朝阳区东大桥路 9 号侨福芳草地大厦 D 座 7 层

电话：+86 18510663466/ +86 13910303666

邮编：100020

以及北京尚野影视文化传媒有限公司：陈建中 员工

**UCFTI, Inc.（美中影视产业博览会）**，一家根据美利坚合众国加利福尼亚州法律设立的股份有限公司，以下简称为"**被申请人一**"。

地址：7083 Hollywood Blvd., 5th Floor, Los Angeles, CA, 900028, USA

负责人：ZUO HONG CHEN（陈左虹/BIANCA CHEN）

被申请人一在本案中的代理人为：

北京易和展达律师事务所：宁晓林 律师，王小艾 律师

地址：中国北京市东城区东中街 29 号东环广场 B 座写字楼 6 层 6K

电话：+86  13661074447/ +86 15810752836

邮编：100006

以及

陈左虹（CHEN ZUOHONG/BIANCA CHEN），一名拥有中华人民共和国国籍的自
然人，以下简称为"**被申请人二**"。

护照号码：█████████

联系地址：7083 Hollywood Blvd., 5th Floor, Los Angeles, CA,
900028, USA

被申请人二在本案中无代理人。

以上被申请人一、被申请人二合称"**被申请人**"。

### （二）仲裁庭

3.　本案中，申请人选定**王雪华**先生担任本案仲裁员。由于被申请人未在规定期
　　限内选定或委托北京仲裁委员会/北京国际仲裁中心（以下简称"**仲裁委**"）
　　主任指定仲裁员且当事人双方未在规定期限内共同选定或共同委托仲裁委主
　　任指定首席仲裁员，仲裁委主任根据仲裁规则指定**陈希佳**女士担任本案首
　　席仲裁员、指定**刘承韪**先生担任仲裁员。

4.　前述三位仲裁员于 2020 年 1 月 15 日组成仲裁庭，共同审理本案。

### （三）本案合同

5.　2018 年 5 月 16 日，申请人与被申请人签订了《电影发行权投资合同》（以下
　　简称"**本案合同**"），约定申请人与被申请人一就相关外国影片（以下称
　　"**合作影片**"）在中国大陆地区（以下称"**发行区域**"）的引进和投资进行
　　合作，被申请人二作为担保人承担约定的担保责任。

### （四）仲裁条款

6.　本案合同第十二条约定的适用法律和争议解决条款如下：

　　　"1.甲方和乙方履行本合同受中华人民共和国法律保护、管辖并按其
　　解释。

　　　2.凡因本合同引起的或与本合同有关的任何争议，双方应本着公平公
　　正、互谅互让的精神，友好协商以求解决。协商不成的，应向【北京
　　仲裁委员会】提起仲裁，按照现行有效的仲裁规则在【北京】进行仲
　　裁"。

（五）　适用规则

7.　依据本案合同第十二条约定，本案仲裁程序应依照自 2019 年 9 月 1 日起施
　　行的《北京仲裁委员会仲裁规则》（以下简称"仲裁规则"）第八章关于国际
　　商事仲裁的规则进行。

（六）　适用法律

　　依据本案合同第十二条约定，本案适用的实体法律应为中华人民共和国法律。

（七）　仲裁地

8.　仲裁规则第二十六条第（一）款规定："除非当事人另有约定，本会所在地
　　为仲裁地。本会也可以根据案件具体情况确定其他地点为仲裁地。"根据上
　　述规定，仲裁庭结合本案合同第十二条的约定确定本案的仲裁地应为中华人
　　民共和国北京市。

（八）　仲裁语言

9.　仲裁规则第七十二条第（一）款规定："当事人可以约定仲裁程序中使用的
　　语言。当事人没有约定的，本会或者仲裁庭可以根据案件具体情况确定使用
　　中文或者其他语言为仲裁程序的语言。"

3

10. 仲裁规则第七十二条（三）款规定：**"本会或者仲裁庭可以根据案件具体情况确定国际商事仲裁程序中的书面材料是否需要附具中文译本或者其他语言译本。"**

11. 因双方当事人未约定仲裁语言，结合本案合同文本中所使用语言情况，仲裁庭依据仲裁规则确定以中文作为本案的仲裁语言，并明确就目前仲裁程序中已产生的书面材料不需附具中文译本。

## 二、仲裁程序概述

12. 2019 年 10 月 11 日（北京时间，下同），申请人向仲裁委提交《仲裁申请书》及申请人证据一至证据七。

13. 2019 年 10 月 28 日，仲裁委受理本案。

14. 2019 年 11 月 1 日，仲裁委向被申请人的地址寄送了全部在案仲裁文件。

15. 2019 年 11 月 25 日，仲裁委向被申请人的电子邮件（Bianca@ucftiexpo.com）发送邮件确认了送达情况。

16. 2019 年 11 月 30 日，被申请人的电子邮件回信称正在委托中国境内的律师事务所处理本案，并于 2019 年 12 月 1 日向仲裁委提供了该律师事务所相关人员的联系方式（其中电子邮件：13661074447@163.com）。

17. 2020 年 1 月 9 日及 1 月 10 日，仲裁委向前述被申请人及其所提供的律师事务所电子邮箱发送了邮件确认委托事项及选定仲裁员事项。

18. 2020 年 1 月 10 日及 1 月 16 日，被申请人的电子邮件回信称律师事务所相关人员会与仲裁委联系。

19. 2020 年 1 月 17 日及 1 月 20 日，仲裁委向申请人及被申请人的地址分别发送《组庭通知》，宣布申请人选定王雪华先生担任本案仲裁员。仲裁委主任指

4

定陈希佳女士担任本案首席仲裁员、指定刘承熙先生担任仲裁员，组成仲裁庭，适用国际商事仲裁程序审理本案。

20.  2020 年 3 月 30 日，申请人向仲裁委提交了《关于请求仲裁庭采取临时措施的申请》及补充证据。同日，仲裁庭作出《第一号程序令及考量临时措施申请之日程表》，并且通过电子邮件及邮寄方式发送至各方当事人。

21.  2020 年 3 月 31 日，被申请人的电子邮件回信表示申请展延《第一号程序令及考量临时措施申请之日程表》中所定之日期；同日，申请人表示不同意延期。

22.  2020 年 4 月 2 日，仲裁庭作出《第二号程序令及考量临时措施申请之日程表更新》，并且通过电子邮件及邮寄方式发送至各方当事人。

23.  2020 年 4 月 8 日，申请人与被申请人一出席关于临时措施听证会（网络视讯会议），并就本临时措施申请相关事项进行陈述，并且就网络视讯会议后各方提交补充意见、补充证据及其他材料的时程达成一致意见。

24.  2020 年 4 月 9 日，仲裁委依据当事人在关于临时措施听证会中达成的一致意见作成《关于(2019)京仲案字第 5573 号仲裁案仲裁通知》，并且通过电子邮件及邮寄方式发送至各方当事人。

25.  2020 年 4 月 16 日，申请人提交《关于临时措施申请的调整》以及《关于临时措施申请的补充意见》；仲裁委将前述文件通过电子邮件及邮寄方式发送至被申请人。

26.  2020 年 4 月 24 日，被申请人一提交《关于申请人申请临时措施的答辩意见》；仲裁委将前述文件通过电子邮件及邮寄方式发送至申请人。

27.  2020 年 5 月 11 日，申请人通过电子邮件形式向仲裁庭澄清了其在《关于临时措施申请的调整》中的笔误，仲裁委亦在同日将该电子邮件转送至被申请

人。

28. 2020 年 5 月 15 日，申请人向仲裁庭提交了《中国平安财产保险股份有限公司平安诉讼财产保全责任保险保单保函》，并寄存在仲裁委。

29. 2020 年 5 月 18 日，仲裁庭经合议，作出《关于临时措施的中间裁决书》，并向各方当事人进行送达。后双方当事人经协商，向仲裁庭申请暂缓推进本案仲裁程序，以便双方当事人进行协商以及申请人就前述中间裁决书申请执行。

30. 2021 年 8 月 16 日，申请人向仲裁庭提交了《关于请求恢复北京仲裁委员会（2019）京仲案字第 5573 号案件仲裁程序的申请》，申请仲裁庭恢复本案仲裁程序的审理。

31. 2020 年 8 月 23 日，仲裁庭作出《第三号程序令》，决定恢复本案仲裁程序的审理，并且订于 2021 年 9 月 23 日上午 9:30 在北京开庭审理本案，并且将该文件通过电子邮件及邮寄方式发送至被申请人。

32. 2021 年 9 月 9 日，被申请人一《答辩意见》；仲裁委将前述文件通过电子邮件及邮寄方式发送至申请人。

33. 2021 年 9 月 23 日，仲裁庭如期在北京开庭审理本案，申请人及被申请人一的代理人均出席了本次庭审。庭审中，仲裁庭再次确认了各方授权情况，由被申请人一代理人澄清了其代理身份，否认了被申请人曾向仲裁庭表示的其代理人被申请人二的事项，并确认了庭前进行程序中仲裁文件的送达情况。在无其他证据证明被申请人二有正当理由未出庭的情况下，仲裁庭依据《中华人民共和国仲裁法》第四十二条及仲裁规则第三十二条的规定对被申请人二进行了缺席审理。

34. 庭审中，仲裁组织各方当事人进行了陈述、答辩、举证质证、辩论及最后陈述等仲裁程序。申请人还向仲裁委提交《申请人补充证据清单》及申请人证据二(二)（补充原证据二）、证据七（替代原证据七）、证据八及证据九。

仲裁庭征求被申请人一意见后接受了该些证据。在庭审结束后，仲裁庭向被申请人二发送了该些仲裁文件。

35.    被申请人二在本仲裁程序中经书面通知，但迄未提交任何答辩意见。

### 三、案件事实概述

36.    2018 年 5 月 16 日，申请人与被申请人签订了本案合同，约定申请人与被申请人一就《Hostiles》（中文译名：《敌对分子》）、《Dragged Across Concrete》（中文译名：《逃出泥潭》）、《Fronzo》（中文译名：《方索》）三部影片（以下称"合作影片"）在中国大陆地区（以下称"发行区域"）的引进和投资进行合作，被申请人二作为担保人承担约定的担保责任。

37.    申请人主张，申请人已经依约全额支付被申请人一投资款 135 万美元，但被申请人一未依本案合同第八条的约定就合作影片向申请人转让在发行区域相应比例的发行权并提供相应权利凭证，故申请人依本案合同第八条的约定，请求解约，请求被申请人一依约支付以年利率 20%计算的违约赔偿金，并且请求被申请人二依约承担连带保证责任。

38.    被申请人一自认其已全额收到申请人支付的投资款 135 万美元，并且不否认其未依据本案合同第八条的约定就合作影片向申请人转让在发行区域相应比例的发行权并提供相应权利凭证，但主张违约金过高。

### 四、当事人的仲裁请求及主张

### （一）申请人的仲裁请求及主张

39.    申请人主张，申请人已经依约全额支付被申请人一投资款 135 万美元的投资总额。然而被申请人并未按照合同约定履行合作影片引进的合同义务，主要有：

（1） 被申请人未按照本案合同第八条第一款约定，就《敌对分子》于
2018 年 6 月前、《逃出泥潭》于 2018 年 8 月前、《方索》于 2018
年 12 月前向申请人转让影片在发行区域相应比例的发行权并提供相应
权利凭证；

（2） 被申请人未按照本案合同第八条第二款约定，就《敌对分子》于
2018 年 6 月前、《逃出泥潭》于 2018 年 10 月前、《方索》于 2019
年 3 月前中任一部影片取得《电影片公映许可证》，也未在本条约定
的换片期限内更换其他申请人能选中的在发行区域已经取得发行权的
新影片，未能做到给予申请人新电影授权权利不劣于本合同约定电影
的授权权利。

40. 申请人主张，依据本案合同第九条第 1 款约定（引述如下）被申请人二即
Bianca Chen 作为被申请人一代表，在本案合同最后一页签字处签字，同意
承担连带担保责任：

**"… 该方均由各自代表'自然人'作为担保人，由其个人各自为本公司履
行本合同向另一方提供无限连带担保责任。**

甲方担保人：Bianca Chen（Zuohong Chen/陈左虹）

姓名：Bianca Chen（Zuohong Chen/陈左虹）

护照号： ████████

41. 经申请人多次自行及委托律师敦促被申请人履约，但三部合作影片均未按照
合同第八条第 2 款约定取得龙标，被申请人也未在约定期限提供申请人能够
选中的新影片，达到合同约定的解除条件，故提出仲裁请求如下：

（1） 解除申请人与被申请人于 2018 年 5 月 16 日签署的《电影发行权投资
合同》；

（2） 被申请人一向申请人返还全部投资款 135 万美元，并按照年利率 20%

的标准支付自申请人支付投资款之日（即 2018 年 5 月 23 日及 2018
年 6 月 6 日各付 50%）至实际付款之日的违约赔偿金（暂计至 2019 年
9 月 18 日违约赔偿金金额为 39.906 万美元）；

（3）　被申请人一向申请人支付人民币 20 万元偿付申请人聘请律师的费用
以及临时措施担保保险费用 4.5 万元人民币；

（4）　被申请人一承担本案仲裁费。

（5）　被申请人二就仲裁请求第 2、3、4 项与被申请人一承担无限连带责任。

**（二）被申请人一的答辩**

42.　被申请人一主张其至今履行不能的主要原因是基于中美之间的政策关系及疫
情限制的影响，导致目前无法如约履行，所以不同意解除合同和返还投资款，
请求驳回所有申请人的仲裁请求。

**（三）双方提交的证据**

**申请人的证据**

43.　本案中，申请人为支持自己的仲裁请求，提交了以下证据：

证据 1，本案合同。

证据 2，申请人付款凭证。

证据 2(2)，委托收款书。

证据 3，《通知》及寄送凭证。

证据 4，《律师函》1 及寄送凭证。

证据 5，《律师函》2 及寄送凭证。

证据 6，申请人负责人与被申请人二（即被申请人一授权代表）微信聊天记
录截屏。

9

证据 7，律师费合同、付款记录及发票。

证据 8，临时措施担保保险费。

证据 9，中国电影产业研究报告。

44.　被申请人一提出了答辩意见，但并没有提交证据材料。

45.　被申请人二在本仲裁程序中受书面通知，但迄未就此提交任何答辩意见，也没有提交证据材料。

46.　被申请人一对申请人的证据发表了质证意见。就申请人与被申请人一对真实性均认可的证据，仲裁庭对其真实性予以认可；对于其他证据，仲裁庭将在仲裁庭意见中，结合裁决需要予以论述。

## 五、仲裁庭意见

### （一）有关本案合同的效力

47.　本案合同系当事人各方的真实意思表示，内容不违反中华人民共和国法律和行政法规的强制性规定，因此，仲裁庭认定其合法有效。

### （二）有关申请人的仲裁请求

48.　仲裁庭注意到被申请人一并不否认申请人主张其已经给付全部投资款 135 万美元（先后于 2018 年 5 月 23 日及 2018 年 6 月 6 日各付 50%的投资款）且被申请人一迄未依约履行的事实，被申请人一辩称其系因中美之间的政策关系及疫情限制的影响，以致迄今不能履约。因此，本案审理的重点在于被申请人一是否确实因上述二个原因以致不能履约。

49.　关于中美之间的政策关系，申请人认为所谓的中美贸易战从 2017 年 8 月就开始了，在 2018 年 3 月份、4 月份中美双方就关税问题已经进行过正面交

锋。2018 年 4 月份，中国还发布了《加征关税的公告》，此均发生于本案合同签署之前，并非签约前不可预见；被申请人一亦自承本案合同签署于中美贸易战爆发后，惟主张因中美关系冷，向国内引进限国电影变得格外困难等语。申请人则提交证据 9，中国电影产业研究报告，主张 2018 年、2019 年中国进口电影仍以美国片为主。仲裁庭认为，关于本案合同系签署于中美贸易战爆发后，申请人与被申请人一之主张相同；至于中美贸易战爆发后，是否因此影响被申请人一的履约能力，被申请人一并没有提交证据说明，也没有提交任何证据说明被申请人一曾经试图履约的努力；相对地，申请人则提交了在 2018 年、2019 年中国进口电影仍以美国片为主的证据，故仲裁庭认为被申请人一此部分主张不能获得支持。

50. 关于疫情限制措施是否及如何影响被申请人一的履约能力，被申请人一并没有提交证据说明，也没有提交任何证据说明被申请人一曾经试图履约的努力，因此，仲裁庭认为被申请人一关于疫情限制的主张也不能获得支持。

51. 综上，仲裁庭认为被申请人一违约，申请人有权依据本案合同第八条第 1 款的约定主张解除合同，请求被申请人一退还已收取的全部投资款，共计 135 万美元，并且支付利息。

52. 关于被申请人一主张年利率 20%的利率过高等语，申请人主张年利率 20%系依据本案合同的明文约定，仲裁庭认为，主张违约金过高的被申请人一，负有初步的举证责任，然而被申请人一仅空言主张年利率 20%的利息过高，并没有提交任何证据说明，其主张无法获得支持。仲裁庭注意到，被申请人对于以 135 万美元为基数，按照年利率20%的标准，暂计至 2019 年 9 月 18 日的利息为 39.906 万美元的计算式及数额，除了前述主张年利率 20%的利率过高之外，没有任何其他异议。因此，仲裁庭支持申请人此部分的请求。

53. 关于被申请人二是否承担连带保证责任，申请人认为，依据本案合同第九条第 1 款"该方均由各自代表'自然人'作为担保人，由其个人各自为本公司履行本合同向另一方提供无限连带保证责任"的约定，被申请人二作为被申

请人一的代表，在本案合同最后一页签字处签字，表示同意就被申请人一在本案合同项下的义务承担连带保证责任。被申请人二在本仲裁程序中受书面通知，但迄未就此提交任何答辩意见。仲裁庭审查本案合同第九条第 1 款的约定，认为申请人上述主张有合约依据，可以支持。

**（三）有关本案仲裁费用及其他费用**

54.    依据仲裁规则第五十二条第（一）款规定，"仲裁庭有权在裁决书中确定各方当事人应当承担的仲裁费用和实际发生的其他费用"。尽管申请人第三项及第四项仲裁请求为请求"被申请人一向申请人支付人民币 20 万元偿付申请人聘请律师的费用以及临时措施担保保险费用 4.5 万元人民币"、"被申请人一承担本案仲裁费"，仲裁庭依上引仲裁规则的规定，基于本案情况及上述仲裁庭的认定和意见，裁定如下，被申请人应补偿申请人聘请律师的费用人民币 20 万元及临时措施担保保险费用 4.5 万元；关于本案仲裁费用，应全部由被申请人承担。

**六、裁决**

55.    基于上述事实和理由，仲裁庭依法裁决如下：

（1）    解除申请人与被申请人于 2018 年 5 月 16 日签署的《电影发行权投资合同》。

（2）    被申请人一向申请人返还全部投资款 135 万美元。

（3）    被申请人一向申请人支付暂计至 2019 年 9 月 18 日的利息 39.906 万美元，并应自 2019 年 9 月 19 日起至实际支付之日止，以 135 万美元为基数，按照年利率20%的标准，继续向申请人支付利息。

（4）    被申请人向申请人支付人民币 20 万元偿付申请人聘请律师的费用以及临时措施担保保险费用 4.5 万元人民币。

（5）    本案仲裁费人民币 148,779.33 元（含仲裁员报酬人民币 92,082.31 元、机构费用人民币 56,697.02 元）已由申请人全额预付，全部由被

申请人承担。因此，被申请人应向申请人支付人民币 148,779.33 元，以补偿申请人代其垫付的仲裁费。

（6）被申请人二就上述第（2）（3）项裁决应支付的款项与被申请人一承担无限连带责任。

（7）驳回申请人的其他仲裁请求。

56. 上述被申请人应向申请人支付的款项，被申请人应于本裁决书送达之日起10 日内履行完毕。

57. 本裁决为终局裁决，自作出之日起生效。

王雪华

———————————

王雪华

（仲裁员）

刘承题

———————————

刘承题

（仲裁员）

陈希佳

———————————

陈希佳

（首席仲裁员）



13

**Beijing Arbitration Commission/ Beijing International Arbitration Center**

**(2019) JZA ZI No. 5573 Arbitration Case**

_____

**Beijing Shangye Film and Television Culture Media Co., Ltd.**

*(Applicant)*

*and*

**UCFTI, Inc.(UCFTI EXPO)**

*(Respondent I)*



**Bianca Chen　（Chen zuohong）**

*(Respondent II)*

_____

# Arbitration Award

(2021) JZC ZI No. 4271

(Made in accordance with the Arbitration Rules of Beijing Arbitration Commission implemented

from September 1, 2019)

_____

**Arbitral tribunal:** Xijia Chen (Chief), Xuehua Wang, Chengwei Liu

**Place of arbitration:** Beijing China

December 7, 2021

Table of Contents

I. Introduction................................................................................................................3

    (I) Parties...............................................................................................................3

    (II) Arbitral tribunal............................................................................................4

    (III) Contract in this case....................................................................................5

    (IV) Arbitration terms.........................................................................................5

    (V) Applicable rules............................................................................................5

    (VI) Applicable laws...........................................................................................5

    (VII) Place of arbitration.....................................................................................6

    (VIII) Arbitration language.................................................................................6

II. Overview of the Arbitration Procedure....................................................................6

III. Overview of Case Facts............................................................................................9

IV. Arbitration Requests and Claims of the Parties.....................................................10

    (I) Arbitration requests and claims of the Applicant.......................................10

    (II) Respondent I's defense...............................................................................12

    (III) Evidence submitted by both parties..........................................................12

    Applicant's evidence........................................................................................12

V. Opinions of the Arbitral Tribunal...........................................................................13

    (I) Validity of the Contract in this case............................................................13

    (II) Arbitration requests of the Applicant........................................................13

    (III) Arbitration fee and other expenses of this case.......................................15

VI. Rulings....................................................................................................................15

Seal on the Performance of Beijing Arbitration Commission (sealed)

## I. Introduction

### (I) Parties

1. The parties of this arbitration case include:

2. **Beijing Shangye Film and Television Culture Media Co., Ltd.**, a limited liability company registered and established according to the laws of the People's Republic of China, hereinafter referred to as "**Applicant**".

Domicile: Inner 1, No. 1307, Unit B, Floor 13, Building No. 1, Yard No. 13, Beiyuan Road, Chaoyang District, Beijing, China

Contact address: B-1307, Building No. 1, Yard No. 13, Beiyuan Road, Chaoyang District, Beijing, China

Legal representative: Yan Yi

The Applicant's agent in this case is:

Beijing Dentons Law Firm: lawyer Wanlin Shi, lawyer Meng Yuan

Address: Floor 7, Block D, Qiaofu Fangcaodi Plaza, No. 9, Dongdaqiao Road, Chaoyang District, Beijing, China

Tel.: +86 18510663466 /+86 13910303666

Zip code: 100020

And Beijing Shangye Film and Television Culture Media Co., Ltd.: employee James Chan

**UCFTI, Inc.(UCFTI EXPO)**, an incorporated company established according to the laws of California, United States of America, hereinafter referred to as "**Respondent I**".

Address: 7083 Hollywood Blvd., 5th Floor, Los Angeles, CA, 900028, USA

Seal on the Performance of Beijing Arbitration Commission (sealed)

Person in charge: Bianca Chen （Chen zuohong）

The Respondent I's agent in this case is:

Beijing Yihe Zhanda Law Firm: lawyer Xiaolin Ning, lawyer Xiao'ai Wang

Address: 6K, Floor 6, Tower B Office Building, East Gate Plaza, Dongcheng District, Beijing, China

Tel.: +86 13661074447/ +86 15810752836

Zip code: 100006



And

**Bianca Chen** （**Chen zuohong**）, a natural person with the nationality of the People's Republic of China, hereinafter referred to as "**Respondent II**"

Passport No.: ████████

Contact address: 7083 Hollywood Blvd., 5th Floor, Los Angeles, CA, 900028, USA

The Respondent II has no agent in this case.

The aforesaid Respondent I and Respondent II are collectively referred to as "**Respondent**".

## (II) Arbitral tribunal

3.    In this case, the Applicant chooses Mr. **Xuehua Wang** as the Arbitrator of this case. As the Respondent fails to select or entrust the Arbitrator designated by the Director of Beijing Arbitration Commission/ Beijing International Arbitration Center (hereinafter referred to as the "**Arbitration Commission**") and both parties do not jointly select or jointly entrust Chief Arbitrator designated by the Director of the Arbitration Commission, the Director of the Arbitration Commission designates Ms. **Xijia Chen** as the Chief Arbitrator of this case and designates Mr. **Chengwei Liu** as the Arbitrator according to Arbitration Rules.

4.    The aforesaid three Arbitrators formed an Arbitral Tribunal on January 15, 2020 to hear this case together.

### (III) Contract in this case

5.    On May 16, 2018, the Applicant and the Respondent entered into the Film Distribution Right Investment Contract (hereinafter referred to as "**the Contract in this case**"), stipulating that the Applicant and the Respondent I shall cooperate with each other about the introduction and investment of the relevant foreign films (hereinafter referred to as the "**cooperative films**") in mainland China (hereinafter referred to as the "**distribution area**"); the Respondent II shall bear the guarantee responsibility agreed upon as guarantor.

### (IV) Arbitration terms

6.    Applicable laws and dispute settlement terms stipulated in Article 12 of the Contract in this case are as follows:

*"1. The performance of this Contract by Party A and Party B is protected and governed by and interpreted according to the laws of the People's Republic of China.*

*2. Both parties shall negotiate friendly about any disputes arising from or in connection with this Contract for settlement, in spirits of fairness, justice, mutual understanding and mutual humility. If negotiation fails, they shall apply to [Beijing Arbitration Commission] for arbitration in Beijing according to the existing Arbitration Rules".*

### (V) Applicable rules

7.    According to Article 12 of the Contract in this case, the arbitration procedure of this case shall be conducted according to Chapter VIII Rules on International Commercial Arbitration of the Arbitration Rules of Beijing Arbitration Commission (hereinafter referred to as the "Arbitration Rules") implemented from September 1, 2019.

### (VI) Applicable laws

In accordance with Article 12 of the Contract in this case, the entity laws applicable to this case shall be the laws of the People's Republic of China.

Seal on the Performance of Beijing Arbitration Commission (sealed)

**(VII) Place of arbitration**

8.    Paragraph (I), Article 26 of the Arbitration Rules stipulates, *"Unless otherwise agreed upon by the parties, the location of this Commission is the place of arbitration. This Commission may also determine another place as the place of arbitration according to the specific situation of the case."* According to the aforesaid provision, the Arbitral Tribunal determines the place of arbitration of this case as Beijing, the People's Republic of China according to the provision of Article 12 of the Contract.

**(VIII) Arbitration language**

9.    Paragraph (I), Article 72 of the Arbitration Rules stipulates, *"The parties may agree on the language to be used in the arbitration procedure. If the parties do not agree on it, this Commission or the Arbitral Tribunal may determine to use Chinese or other languages as the language of the arbitration procedure according to the specific situation of the case."*

10.    Paragraph (III), Article 72 of the Arbitration Rules stipulate, *"This Commission or the Arbitral Tribunal may determine whether Chinese translation or other languages' translation is required for the written materials in international commercial arbitration procedures."*

11.    As both parties have not agreed on the arbitration language, in combination with the language used in the text of the contract of this case, the Arbitral Tribunal determines Chinese as the arbitration language of this case according to the Arbitration Rules, and clarifies that no Chinese translation is required for the written materials generated from the current arbitration procedure.

## II. Overview of the Arbitration Procedure

12.    On October 11, 2019 (Beijing time, same below), the Applicant submitted the Arbitration Application and the Applicant's evidence I to evidence VII to the Arbitration Commission.

13.    On October 28, 2019, the Arbitration Commission heard this case.

14.    On November 1, 2019, the Arbitration Commission sent all arbitration documents in case to the Respondent's address.

15.    On November 25, 2019, the Arbitration Commission sent an e-mail to confirm the delivery to

the Respondent's e-mail (Bianca@ucftiexpo.com).

16.   On November 30, 2019, the Respondent replied by e-mail that it was entrusting a law firm within the territory of China to process this case, and provided the Arbitration Commission with the contact information of the relevant personnel of this law firm (including e-mail: 13661074447@163.com) on December 1, 2019.

17.   On January 9 and January 10, 2020, the Arbitration Commission sent an e-mail to the e-mail addresses of the aforesaid Respondent and the law firm provided by the Respondent, to confirm the entrustment matters and Arbitrator selection matters.

18.   On January 10 and January 16, 2020, the Respondent replied by e-mail that the relevant personnel of the law firm would contact the Arbitration Commission.

19.   On January 17 and January 20, 2020, the Arbitration Commission sent the Arbitral Tribunal Formation Notice to the addresses of the Applicant and the Respondent, respectively, announcing that the Applicant selected Mr. Xuehua Wang to serve as the arbitration of this case. The Director of the Arbitration Commission designated Ms. Xijia Chen as the Chief Arbitrator of this case and Mr. Chengwei Liu as the Arbitrator, to form the Arbitral Tribunal, which would hear this case applying international commercial arbitration procedures.

20.   On March 30, 2020, the Applicant submitted the Application for Requesting the Arbitral Tribunal to Take Temporary Measures and supplementary evidence to the Arbitration Commission. On the same day, the Arbitral Tribunal made the No. 1 Procedure Order and Timeline for Consideration of the Temporary Measures Application and sent to the parties by e-mail and mail.

21.   On December 31, 2020, the Respondent replied by e-mail, showing application for extending the date determined in the No. 1 Procedure Order and Timeline for Consideration of the Temporary Measures Application; on the same day, the Applicant showed disagreement to the extension.

22.   On April 2, 2020, the Arbitral Tribunal made the Update of the No. 2 Procedure Order and Timeline for Consideration of the Temporary Measures Application and sent to the parties by e-mail and mail.

Seal on the Performance of Beijing Arbitration Commission (sealed)

23.  On April 8, 2020, the Applicant and the Respondent I attended the hearing (online video meeting) of temporary measures, stated the matters concerning the application for temporary measures and reached a consensus on the schedule for the parties to submit supplementary opinions, supplementary evidence and other materials.

24.  On April 9, 2020, the Arbitration Commission made the Arbitration Notice on (2019) JZA ZI No. 5573 Arbitration Case according to the consensus reached by the parties in the hearing of temporary measures, and sent it to the parties by e-mail and mail.

25.  On April 16, 2020, the Applicant submitted the Adjustment of the Application for Temporary Measures and Supplementary Opinions on the Application for Temporary Measures; the Arbitration Commission sent the aforesaid documents to the Respondent by e-mail and mail.

26.  On April 24, 2020, the Respondent I submitted the Defense Opinions on the Applicant's Application for Temporary Measures; the Arbitration Commission sent the aforesaid document to the Applicant by e-mail and mail.

27.  On May 11, 2020, the Applicant clarified its clerical errors in the Adjustment of the Application for Temporary Measures to the Arbitral Tribunal by e-mail. The Arbitration Commission also forwarded the e-mail to the Respondent on the same day.

28.  On May 15, 2020, the Applicant submitted the Guarantee of the Policy of Ping An Litigation Property Preservation Liability Insurance of Ping An Property & Casualty Insurance Company Of China, Ltd. to the Arbitral Tribunal, which was deposited in the Arbitration Commission.

29.  On May 18, 2020, the Arbitral Tribunal made the Interim Award of Temporary Measures after panel discussion and delivered it to the parties. Then, after negotiation, the parties applied to the Arbitral Tribunal for suspending the advancement of the arbitration procedure of this case so that both parties could negotiate, and the Applicant applied for executing the aforesaid Interim Award.

30.  On August 16, 2021, the Applicant submitted the Application for Requesting to Resume the Arbitration Procedure of (2019) JZA ZI No. 5573 Case of Beijing Arbitration Commission to the Arbitral Tribunal to request the Arbitral Tribunal to resume the hearing of the arbitration procedure of this case.

Seal on the Performance of Beijing Arbitration Commission (sealed)

31.  On August 23, 2020, the Arbitral Tribunal made No. 3 Procedure Order, decided to resume the hearing of the arbitration procedure of this case, determined to hear the case in Beijing at 9:30am on September 23, 2021, and sent the document to the Respondent by e-mail and mail.

32.  On September 9, 2021, the Respondent I Defense Opinions; the Arbitral Tribunal sent the aforesaid document to the Applicant by e-mail and mail.

33.  On September 23, 2021, the Arbitral Tribunal heard the case in Beijing as scheduled. The agents of the Applicant and the Respondent I attended this court hearing. In the court hearing, the Arbitral Tribunal confirmed the authorization of the parties again. The agent of the Respondent I clarified its agency identity, denied it acting as the Respondent II which was expressed by the Respondent to the Arbitral Tribunal and confirmed the delivery of the arbitration documents in the pre-trial procedure.

Under the circumstance where there was no other evidence proving that the Respondent II had justified reasons to be absent from the court hearing, the Arbitral Tribunal conducted a default hearing on the Respondent II in accordance with the provisions of Article 42 of the Arbitration Law of the People's Republic of China and Article 32 of the Arbitration Rules.

34.  During the court hearing, the Arbitral Tribunal organized the parties to conduct arbitration procedures such as statement, defense, evidence and cross-examination, debate and final statement. The Applicant also submitted the List of Supplementary Evidence of the Applicant, the Applicant's evidence II (II) (supplement to the original evidence II), evidence VII (replacement of the original evidence VII), evidence VIII and evidence IX to the Arbitration Commission.

The Arbitral Tribunal accepted the evidence after soliciting the Respondent I's opinion. After the court hearing ended, the Arbitral Tribunal sent these arbitration documents to the Respondent II.

35.  The Respondent II has not submitted any defense opinions till now after written notice in this arbitration procedure.

## III. Overview of Case Facts

36.  On May 16, 2018, the Applicant and the Respondent entered into the Contract in this case, agreeing that the Applicant and the Respondent I shall cooperate with each other about the

introduction and investment of three films: Hostiles (Chinese name: 敌对分子), Dragged Across Concrete (Chinese name: 逃出泥潭), Fronzo (Chinese name: 方索) (hereinafter referred to as "cooperative films") in mainland China (hereinafter referred to as the "distribution area"); the Respondent II shall bear the guarantee responsibility agreed upon as guarantor.

37. The Applicant claims that the Applicant has paid the investment fund of USD 1.35 million to the Respondent I in full as agreed, but the Respondent I did not transfer the corresponding proportion of the distribution right of the cooperative films in the distribution area in accordance with Article 8 of the Contract in this case, or provide the corresponding right voucher. Thus, the Applicant requests to cancel the Contract according to Article 8 of the Contract in this case, requests the Respondent I to pay a liquidated damage at an annual interest rate of 20% as agreed and requests the Respondent II to bear joint and several warranty liability as agreed.

38. The Respondent I believes that it has received the investment fund of USD 1.35 million paid by the Applicant and does not deny its failure to transfer the corresponding proportion of the distribution right of the cooperative films in the distribution area as stipulated in Article 8 of the Contract in this case and provide the corresponding voucher, but claims that the liquidated damage is too much.

## IV. Arbitration Requests and Claims of the Parties

### (I) Arbitration requests and claims of the Applicant

39. The Applicant claims that the Applicant has paid the total investment amount of USD 1.35 million to the Respondent I in full as agreed. However, the Respondent has not performed the contract obligation of introducing the cooperative films as agreed in the Contract, mainly including:

(1) The Respondent failed to transfer the corresponding proportion of the distribution right of the films (Hostiles before June 2018, Dragged Across Concrete before August 2018 and Fronzo before December 2018) in the distribution area and provide the corresponding right voucher to the Applicant in accordance with Paragraph I, Article 8 of the Contract in this case;

(2) The Respondent did not obtain the Film Release License for any film of Hostiles before June

2018, Dragged Across Concrete before October 2018 and Fronzo before March 2019 in accordance with Paragraph II, Article 8 of the Contract in this case, nor did it replace other new films with the distribution right in the distribution area which the Applicant could select within the replacement term specified in this article, or give the Applicant an authorization right to new films not worse than the films specified in the Contract.

40.  The Applicant claims that the Respondent II, i.e. Bianca Chen  （Chen zuohong）, shall sign on the signature place of the last page of the Contract in this case as the representative of the Respondent I, and agree to bear joint and several guarantee liability in accordance with Paragraph 1, Article 9 of the Contract in this case (quoted below):

**"…This party's representative "natural person" serves as the guarantor, which provides the other party with limitless joint and several guarantee liability for the company's performance of this Contract.**

Party A's guarantor: Bianca Chen  （Chen zuohong）

Name: Bianca Chen  （Chen zuohong）

Passport: ████████

41.  After the Applicant urged and entrusted a lawyer to urge the Respondent to perform the Contract for many times, three cooperative films failed to obtain the Film Release License according to Paragraph 2, Article 8 of the Contract; the Respondent did not provide new films which the Applicant could select within the term prescribed. The cancellation conditions specified in the Contract are met, so the arbitration requests are raised as follows:

(1)  Cancelling the Film Distribution Right Investment Contract entered into by and between the Applicant and the Respondent on May 16, 2018;

(2)  The Respondent I returns the entire investment fund of USD 1.35 million to the Applicant and pays a liquidated damage at a standard of annual interest rate of 20% from the day on which the Applicant paid the investment fund (i.e. 50% on May 23, 2018 and June 6, 2018, respectively) to the actual payment day (the amount of the liquidated damage was USD 399,060 tentatively to September 18, 2019);

(3)   The Respondent I pays RMB 200,000 to the Applicant to repay the Applicant's expense for hiring a lawyer and RMB 45,000 yuan expense for temporary measures guarantee insurance;

(4)   The Respondent I assumes the arbitration fee of this case;

(5)   The Respondent II assumes limitless joint and several liability with the Respondent I in view of items 2, 3 and 4 of the arbitration requests.

## (II) Respondent I's defense

42.   The Respondent I claims that the main reasons for failure of performance till now are the influence of the policy relationship China and the U.S. and the influence of the restrictions of the epidemic, which causes failure of performance as agreed at present. Thus, it disagrees to cancel the Contract and return the investment fund, and requests that all of the Applicant's arbitration requests be dismissed.

## (III) Evidence submitted by both parties

## Applicant's evidence

43.   In this case, the Applicant submitted the following evidence in order to support its arbitration requests:

Evidence 1, the Contract in this case.

Evidence 2, the Applicant's payment voucher.

Evidence 2(2), Entrusted Collection Letter.

Evidence 3, Notice and sending voucher.

Evidence 4, Lawyer's Letter 1 and sending voucher.

Evidence 5, Lawyer's Letter 2 and sending voucher.

Evidence 6, screenshots of the chatting records of the person in charge of the Applicant and the Respondent II (i.e. the authorized representative of the Respondent I) in WeChat.

Evidence 7, lawyer's fee contract, payment records and invoices.

Seal on the Performance of Beijing Arbitration Commission (sealed)

Evidence 8, expense for temporary measures guarantee insurance.

Evidence 9, China's Film Industry Research Report.

44.   The Respondent I puts forward defense opinions but has not submitted evidence materials.

45.   The Respondent II has not submitted any defense opinion or evidence materials till now after being notified in writing in this arbitration procedure.

46.   The Respondent I has issued cross-examination opinions on the evidence of the Applicant. The Arbitral Tribunal recognizes the authenticity of the evidence whose authenticity is recognized by both the Applicant and the Respondent I; the Arbitral Tribunal will discuss other evidence in the opinions of the Arbitral Tribunal in combination with the award needs.

## V. Opinions of the Arbitral Tribunal

### (I) Validity of the Contract in this case

47.   The Contract in this case is the true intention of the parties, and its content does not violate the mandatory provisions of laws and administrative regulations of the People's Republic of China. Therefore, the Arbitral Tribunal affirms its legitimacy and validity.

### (II) Arbitration requests of the Applicant

48.   The Arbitral Tribunal notices that the Respondent does not deny the facts that the Applicant claims that the Applicant has paid the entire investment fund of USD 1.35 million (50% of the investment fund on May 23, 2018 and June 6, 2018, respectively) and that the Respondent I has not performed the contract as agreed till now. The Respondent I defends that it fails to perform the Contract due to the influence of the policy relationship China and the U.S. and the restrictions of the epidemic. Therefore, the focus of this case is whether the Respondent I cannot perform the Contract due to the aforesaid two reasons.

49.   In view of the policy relationship between China and the U.S., the Applicant believes that the so-called Sino-U.S. trade war started in August 2017, and China and the U.S. already had a head-to-head confrontation on the issue of tariffs in March and April 2018. In April 2018, China also issued the Announcement on the Imposition of Increased Tariffs, which occurred before the

signing of the Contract in this case and is not unforeseeable before the signing of the Contract; the Respondent I also admitted that the Contract in this case was signed after the Sino-U.S. trade war broke out, but claimed that due to the cold Sino-U.S. relationship, it has become extremely difficult to import restricted films into China. The Applicant submitted evidence 9 China's Film Industry Research Report, claiming that imported films in China in 2018 and 2019 are mainly U.S. films. The Arbitral Tribunal believes that the Applicant and the Respondent I claim the same which the Contract in this case was signed after the outbreak of the Sino-U.S. trade war; regarding whether the contractual capacity of the Respondent I is affected hence, the Respondent I has not submitted evidence nor has it submitted any evidence proving that the Respondent I once made efforts to perform the Contract; on the contrary, the Applicant submitted evidence proving that the imported films in China in 2018 and 2019 are still mainly U.S. films; thus the Arbitral Tribunal believes that this claim of the Respondent I cannot be supported.

50.   Regarding whether and how the restrictive measures of the epidemic affect the contractual capacity of the Respondent I, the Respondent I has not submitted evidence nor has it submitted any evidence proving that the Respondent once made efforts to perform the Contract. Therefore, the Arbitral Tribunal believes that the Respondent I's claim of restrictions of the epidemic cannot be supported as well.

51.   In conclusion, the Arbitral Tribunal believes that the Respondent I breaches the Contract, and the Applicant has the right to claim the cancellation of the Contract according to the provision of Paragraph 1, Article 8 of the Contract in this case and request the Respondent I to return the entire investment fund collected, a total of USD 1.35 million, and pay interest.

52.   Regarding the Respondent I's claim which is the annual interest rate of 20% is too high, the Applicant claims that the annual interest rate of 20% is based on the express provision of the Contract in this case. The Arbitral Tribunal believes that the Respondent I claiming that the liquidated damage is too much has the initial burden of proof. However, the Respondent I merely claims that the annual interest rate of 20% is too high by gratis dictum and has not submitted any evidence. Its claim cannot be supported. The Arbitral Tribunal notices that the Respondent has no objection about the calculation formula of taking USD 1.35 million as base, according to the standard of 20% annual interest rate, the amount of interest temporarily calculated to September

18, 2019, which is USD 399,060, except that the annual interest rate of 20% above claimed is too high. Therefore, the Arbitral Tribunal supports this request of the Applicant.

53.  Regarding whether the Respondent II bears joint and several warranty liability, the Applicant believes that according to Paragraph 1, Article 9 of the Contract of this case "This party's representative "natural person" serves as the guarantor, which provides the other party with limitless joint and several guarantee liability for the company's performance of this Contract", the Respondent II, as the representative of the Respondent I, signs on the signing place of the last page of the Contract in this case, indicating that it agrees to bear joint and several warranty liability for the Respondent I's obligations under the Contract in this case. The Respondent II has not submitted any defense opinion so far after notified in writing in this arbitration procedure. The Arbitral Tribunal examines the provision of Paragraph 1, Article 9 of the Contract in this case and believes that the Applicant's claim above has contractual basis and can be supported.

### (III) Arbitration fee and other expenses of this case

54.  In accordance with Paragraph (I), Article 52 of the Arbitration Rules, "the Arbitral Tribunal has the right to determine in the award the arbitration fee and other expenses actually occurred which the parties shall assume". Although the third and fourth arbitration requests of the Applicant are "the Respondent should pay RMB 200,000 yuan to repay the Applicant's expense for hiring a lawyer and RMB 45,000 yuan expense for temporary measures guarantee insurance", "the Respondent assumes the arbitration fee of this case by itself", the Arbitral Tribunal, based on the situation of this case and the aforesaid affirmation and opinions of the Arbitral Tribunal, judges as follows: the Respondent shall make up RMB 200,000 yuan of the Applicant's expense for hiring a lawyer and RMB 45,000 yuan expense for temporary measures guarantee insurance; the arbitration fee of this case shall be all assumed by the Respondent.

### VI. Rulings

55.  Based on the aforesaid facts and reasons, the Arbitral Tribunal rules as follows according to law:

(1)  Cancelling the Film Distribution Right Investment Contract entered into by and between the

Applicant and the Respondent on May 16, 2018.

(2)   The Respondent I should return the entire investment fund of USD 1.35 million to the Applicant.

(3)   The Respondent I should pay an interest of USD 399,060 calculated to September 18, 2019 to the Applicant and continue paying interest to the Applicant based on USD 1.35 million, according to the standard of annual interest rate of 20% from September 19, 2019 to the actual payment day.

(4)   The Respondent should pay RMB 200,000 to the Applicant to repay the Applicant's expense for hiring a lawyer and RMB 45,000 expense for temporary measures guarantee insurance.

(5)   The arbitration fee of this case, which is RMB 148,779.33 (including remuneration for the Arbitrators RMB 92,082.31 yuan and institution fee RMB 56,697.02 yuan), has been prepaid by the Applicant, and shall be all assumed by the Respondent. Therefore, the Respondent should pay RMB 148,779.33 yuan to the Applicant to make up the arbitration fee paid by the Applicant for it in advance.

(6)   The Respondent II assumes limitless joint and several liability with the Respondent I in regard of the funds which should be paid under the aforesaid (2) and (3) rulings.

(7)   Other arbitration requests of the Applicant are dismissed.

56.   The Respondent should pay the funds which the aforesaid Respondent should pay within 10 days from the day of delivery of this Award.

57.   This award is final and shall take effect from the day it is made.

<table>
<tr><td align="center">Xuehua Wang (signature)</td><td align="center">Chengwei Liu (signature)</td></tr>
<tr><td align="center">Xuehua Wang</td><td align="center">Chengwei Liu</td></tr>
<tr><td align="center">(Arbitrator)</td><td align="center">(Arbitrator)</td></tr>
</table>

Xijia Chen (signature)

Xijia Chen

(Chief Arbitrator)

Beijing Arbitration Commission (sealed)

Seal on the Performance of Beijing Arbitration Commission (sealed)



# 营 业 执 照 （副本）

统一社会信用代码 91440300788349389W

名　　称　深圳市欧得宝翻译有限公司

类　　型　有限责任公司

住　　所　深圳市罗湖区宝安南路2014号振业大厦A座
　　　　　15D#

法定代表人　黄荣发

成 立 日 期　2006年05月12日

重
要
提
示

1、商事主体的经营范围由章程确定。经营范围中属于法律、法规规定应当经批准的项目，取得许可审批文件后方可开展相关经营活动。

2、商事主体经营范围和许可审批项目等有关事项及年报信息和其他信用信息，请登录深圳市市场和质量监督管理委员会商事主体信用信息公示平台（网址http://www.szcredit.org.cn）或扫描执照的二维码查询。

3、商事主体须于每年1月1日－6月30日向商事登记机关提交上一年度的年度报告。商事主体应当按照《企业信息公示暂行条例》等规定向社会公示商事主体信息。



此证件仅供本公司为＿＿＿＿＿
公司/个人提供资质证明使用

登 记 机 关



2018 年 1 月 8 日

中华人民共和国国家工商行政管理总局监制



# 中 国 翻 译 协 会

## 会 员 证 书

会员类别：单位会员

会员名称：深圳市欧得宝翻译有限公司

颁发时间：2020 年 12 月

统一编号：DD170819

中国翻译协会

2020 年 12 月 21 日

（有效期至 2022 年 12 月 31 日）



# 国际标准认证证书

**标准：**  GB/T19001-2016 idt ISO9001:2015

**证书登记号：**  UKS001-2019Q0255

**兹证明：**

**证书持有者：**  深圳市欧得宝翻译有限公司

组织机构（信用）代码:91440300788349389W

注册地址：深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

经营地址：深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

**认证范围：**  翻译服务

通过优卡斯国际认证（深圳）有限公司现场审核，
证明满足了 GB/T19001-2016 idt ISO9001:2015 标准的要求

**有效期：**  本次发证日期：2021 年 04 月 02 日

本次有效日期：2022 年 04 月 11 日

首次注册日期：2019 年 04 月 12 日          注册有效期：2022 年 04 月 11 日





CNCA-R-2016-268

本证书由优卡斯国际认证（深圳）有限公司注册颁发;获证组织应于证书有效日期前按规定执行监督审核并更换本证书;
认证资格是否有效应登陆优卡斯国际认证（深圳）有限公司官方网站www.uks-sz.com查询证书信息;
亦可在国家认证认可监督管理委员会官方网站（www.cnca.gov.cn）上查询。

地址：深圳市宝安区西乡街道西部国际珠宝城创意研发大厦B座702室          邮编：518101



# Business License (Duplicate)

**Unified Social Credit Code: 91440300788349389W**

**Company Name:** Shenzhen ODB Translation Co., Ltd.

**Type of Business:** Limited Liability Company

**Place of Business:** 15D#, Block A, Zhenye Building, No. 2014 Bao'an Road South, Luohu District, Shenzhen

**Legal Representative:** Huang Rongfa

**Date of Incorporation:** May 12, 2006

**Important Notes**

1. Business scope of the commercial subject is determined by its articles of association. Any item as specified in the business scope and requiring examination and approval as stipulated by laws and regulations cannot be engaged until all required approval documents have been granted.

2. In terms of business scope, licensed and approved business items of the commercial subject as well as its annual financial reports and other credit information, please visit the commercial subject credit information publicity platform provided by the Market and Quality Supervision Commission of Shenzhen Municipality (http://www.szcredit.com.cn) or scan QR Code as below for query.

3. The commercial subject should submit its annual report for the previous year to its business registration authorities from January 1st to June 30th of every year. The commercial subject should disclose its information to the society in accordance with the provisions of the *Interim Regulation on Enterprise Information Disclosure*.



**Registration Authority:**

Seal: Market Supervision Administration Bureau of Shenzhen Municipality

**November 08, 2018**

Made and Supervised by the State Administration for Industry & Commerce of the People's Republic of China

# Translators Association of China

## Certificate of Member

Category of Member: Entity Member

Member Name: Shenzhen ODB Translation Co., Ltd.

Issue Time: December 2020

Uniform Number: DD170819

Translators Association of China
December 21, 2020
(Valid to December 31, 2022)
Translators Association of China (Seal)

Quality Management System

# INTERNATIONAL STANDARD CERTIFICATION

**standard:** GB/T19001-2016 idt ISO9001:2015

**Certificate registration number:** UKS001-2019Q0255

**It is hereby certified:**

**Certificate holder :** Shenzhen ODB Translation Co., Ltd.

Organization (credit) code : 91440300788349389W

Registered address : 15/D, Block A, Zhenye Building, South Baoan Road, Luohu District, Shenzhen

Business Address : 15/D, Block A, Zhenye Building, South Baoan Road, Luohu District, Shenzhen

**Certification scope :** Translation Services

Through UKS International Certification (Shenzhen) Co., Ltd on-site audit, Proof to meet the requirements of the GB/T19001-2016 idt ISO9001:2015 standard

**Valid period :**

Issued   date : April 2, 2021
Effective date： April 11, 2022

First registration date : April 12, 2019

Registration valid date : April 11, 2022



CNCA-R-2016-268





This certificate shall be issued by UKS International Certification (Shenzhen) Co., Ltd.; the certified organization shall, within the effective date of the certificate, perform the supervision and examination and replace the certificate;Whether the certification is valid or not. Please visit the official website at www.uks-sz.com.lt can also be found on the official website of the National Certification and Accreditation Administration (www.cnca.gov.cn).

Address: Room 702, building B, creative r&d building, west international jewelry city, xixiang street, bao 'an district, shenzhen Postcode: 518101



THE AMERICAN TRANSLATORS ASSOCIATION
Founded in 1959

*Oudebao Translation Company*

subscribes to the

ATA Code of Professional Conduct and Business Practices

and is herewith granted this

Certificate of
Corporate
Membership

since
2011

Nicholas Hartmann
President

Virginia Perez-Santalla
Secretary

This certificate is valid only in combination with a membership card in good standing in the American Translators Association.



# 质量管理体系认证证书

**证书号：46622Q1011586R0S**



**兹证明**

## 深圳市欧得宝翻译有限公司

**统一社会信用代码：91440300788349389W**

注册地址：深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

经营地址：广东省深圳市罗湖区宝安南路 2014 号振业大厦 A 座 15D#

**建立的管理体系符合**

## GB/T19001-2016 /ISO9001:2015



**认证范围**

翻译服务

**颁证日期：** 2022 年 03 月 30 日
**有效日期：** 2025 年 03 月 29 日

在国家规定的各行政、资质许可范围内及有效期内使用有效，获证组织在证书有效期内需按期接受监督审核，监督审核合格后使用有效，本证书信息可在国家认证认可监督管理委员会官方网站（www.cnca.gov.cn）上查询。



签发人： 



## 深圳市中鑫认证检测有限公司

地址：深圳市福田区园岭街道八卦四路 2 号先科机电大厦 401-B-5A
网址：www.szccqc.cn    电话：0755-86568634



# QUALITY MANAGEMENT SYSTEM CERTIFICATE

**Certificate No.: 46622Q1011586R0S**

This is to certify that management system of

## Shenzhen ODB Translation Co., Ltd.

Unified social credit code: 91440300788349389W

Registered Address: 15/D,Block A,Zhenye Building, South Baoan Road, Luohu District,Shenzhen

Business Address: 15/D,Block A,Zhenye Building, South Baoan Road, Luohu District,Shenzhen

**Management system in line with:**

## GB/T19001-2016 /ISO9001:2015

**Scope of certification:**

Translation Services

**Date of issue:** March 30, 2022
**Date of expire** : March 29, 2025

It is valid for use within the scope of administrative and qualification permission and the period of validity stipulated by the state. The certificated organization shall be subject to supervision and audit on schedule within the period of validity of the certificate. It is valid for use after passing the supervision and audit. The information of this certificate can be found on the official website of the national certification and Accreditation Administration ( www.cnca.gov.cn ) Inquiry.







General manager.



## Shenzhen Zhongxin certification testing Co., Ltd

Address: 401-b-5a, Xianke electromechanical building, baguasi Road, Futian District, Shenzhen
Website: www.szccqc.cn     Telephone: 0755-86568634